UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.                                    Criminal No. 2:10cr56

MOHAMMED MODIN HASAN,

GABUL ABDULLAHI ALI,

ABDI WALI DIRE,

ABDI MOHAMMED GUREWARDHER,

ABDI MOHAMMED UMAR,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on motions to dismiss Count One of the Superseding Indictment filed by defendants Mohammed Modin Hasan ("Hasan"), Gabul Abdullahi Ali ("Ali"), Abdi Wali Dire ("Dire"), Abdi Mohammed Gurewardher ("Gurewardher"), and Abdi Mohammed Umar ("Umar") (collectively, the "Defendants"). Count One charges Defendants with the offense of piracy as defined by the law of nations, in violation of 18 U.S.C. § 1651. The motions have been fully briefed, the Court has heard oral argument, and the matter is now ripe for decision. After careful consideration, and for the reasons explained in greater detail below, the Court **DENIES** Defendants' motions to dismiss Count One of the Superseding Indictment.

## I.   BACKGROUND[1]

The United States ("Government") alleges that sometime in March 2010, Defendants set off from Somalia in a seagoing vessel in search of a merchant ship to attack and plunder.  Shortly after midnight on the morning of April 1, 2010, somewhere on the high seas between Somalia and the Seychelles, Defendants sighted what they believed to be a merchant ship.  Hasan, Ali, and Dire thereafter boarded one of two small assault boats moored to the seagoing vessel and set out to attack the perceived merchant ship. To facilitate their attack, Hasan carried a rocket-propelled grenade ("RPG"), and Ali and Dire each carried an AK-47 assault rifle.  Gurewardher and Umar meanwhile remained on board the seagoing vessel.

As the crew of the assault boat approached their target, Ali and Dire raised their assault rifles and opened fire on the vessel. To the surprise of Hasan, Dire, and Ali, what they had until then believed to be a merchant vessel quickly revealed itself to be the USS Nicholas, a United States Navy frigate.  After the USS Nicholas returned fire, Hasan, Dire, and Ali fled the scene in their assault boat.  The USS Nicholas gave chase, eventually capturing the

---

[1]   The facts recited here are drawn from the allegations set forth in the Superseding Indictment.  The facts are assumed true only for the purpose of deciding the motions currently before the Court.  The facts recited here are not factual findings for any purpose other than for the consideration of the instant motions to dismiss Count One of the Superseding Indictment.

assault boat, Hasan, Ali, and Dire. The USS Nicholas thereafter searched for, found, and captured the seagoing vessel, along with Gurewardher and Umar.

On April 20, 2010, a federal grand jury returned a six-count Indictment against Defendants. Docket No. 1. On July 7, 2010, a federal grand jury returned a Superseding Indictment charging Defendants with a total of fourteen counts. Docket No. 63. Count One of the Superseding Indictment charges Defendants with piracy, in violation of 18 U.S.C. § 1651. Section 1651 provides that "[w]hoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life." 18 U.S.C. § 1651. The remaining counts of the Superseding Indictment charge Defendants with various acts of violence, assaults with a dangerous weapon, and illegal possession of firearms and an explosive device.

Each Defendant filed a motion to dismiss Count One of the Superseding Indictment. Docket Nos. 71, 83, 86, 88, 95, 105, 116. The Government responded to Defendants' motions to dismiss in a single consolidated filing submitted to the Court on July 30, 2010. Docket No. 118. On August 5, 2010, Hasan, Ali, Dire, and Gurewardher filed a Joint Reply Brief in Support of Their Motions to Dismiss Count One. Docket No. 126. After briefing by the

parties was complete, the Court heard oral argument on September 10, 2010.[2]

## II.  LEGAL STANDARD

The instant motions are filed pursuant to Rule 12 of the Federal Rules of Criminal Procedure.  Rule 12(b)(2) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."  Fed. R. Crim. P. 12(b)(2).  Rule 12(b)(3)(B) further states that "a motion alleging a defect in the indictment" by a defendant "must be raised before trial," but that "at any time

---

[2] On September 7, 2010, the Government filed a short supplemental response to Defendants' motions to dismiss, noting the recent decision on a similar motion by United States District Judge Raymond A. Jackson in United States v. Said, Crim. Action No. 2:10cr57, 2010 WL 3893761 (E.D. Va. Aug. 17, 2010), another case involving piracy charges pending in this District, which is currently on appeal to the United States Court of Appeals for the Fourth Circuit.  Docket No. 155.  The Government's response also attached a declaration dated September 3, 2010 from United States Department of State Legal Adviser Harold Hongju Koh "provid[ing] the [State] Department's views on the definition of piracy under the law of nations."  Koh Decl. ¶ 3.  Counsel for Hasan immediately filed a motion to strike the Government's supplemental response and the Koh Declaration as untimely and improper, because the Government had not first sought leave of court as required by Local Criminal Rule 47(F)(1) of the Local Rules of this Court.  Docket Nos. 156-57.  Hasan also argued that the Koh Declaration constituted inadmissible legal argument presented in the guise of expert opinion.  Docket No. 157 at 3-4.  The Government thereafter filed a motion for leave to file its supplemental response and the Koh Declaration.  Docket No. 160.  In light of the untimeliness of the Government's submissions, as well as the analysis contained in this Opinion and Order, which essentially reaches the same conclusion as the Koh Declaration, the Court will deny the Government's motion for leave to file these submissions and grant Hasan's motion to strike the submissions.

4

while the case is pending, the court may hear a claim that the indictment . . . fails . . . to state an offense." Fed. R. Crim. P. 12(b)(3).  A Rule 12(b)(2) motion asserting that the facts stated in an indictment fail to satisfy the elements of the offense, which may be brought as a pretrial motion,

> is also a correlate of what is now expressly described as a Rule 12(b)(3) motion "alleging a defect in the indictment or information," such as a claim that the indictment "fails . . . to state an offense," which Rule 12(b)(3) provides may be heard "at any time while the case is pending."  The correlation is apparent, because the court cannot determine whether the indictment fails to state an offense unless the court first determines the elements of the offense.

United States v. Salazar-Montero, 520 F. Supp. 2d 1079, 1084 (N.D. Iowa 2007) (quoting Fed. R. Crim. P. 12(b)(3)(B)) (internal citation omitted).

Therefore, to survive a motion to dismiss sought pursuant to Rule 12, an indictment must allege facts that, if proven true, would sustain a violation of the offense charged.  United States v. Shabbir, 64 F. Supp. 2d 479, 481 (D. Md. 1999).  Defendants contend that Count One fails to state an offense because, even if the facts alleged are true, such facts do not satisfy the elements of the charged offense.  Accordingly, Defendants' motions to dismiss Count One should only be granted if the Superseding Indictment fails to set forth facts that are sufficient, if proven true, to constitute the crime of piracy as defined by the law of nations, in violation of 18 U.S.C. § 1651.

### III.  HISTORICAL CONTEXT

For centuries, pirates have been universally condemned as hostis humani generis—enemies of all mankind—because they attack vessels on the high seas, and thus outside of any nation's territorial jurisdiction, without pretense of state authority, irrespective of the target vessel's nationality, and with devastating effect to global commerce and navigation.  See generally Eugene Kontorovich, Implementing Sosa v. Alvarez-Machain: What Piracy Reveals About the Limits of the Alien Tort Statute, 80 Notre Dame L. Rev. 111, 139-53 (2004) (identifying the unique characteristics of piracy that make it a universally cognizable international offense) [hereinafter Kontorovich, Implementing Sosa].  As a result of a dramatic increase in the incidents of piracy at sea off the coast of Somalia in recent years, members of the international community (including the United States) have deployed naval vessels in an effort to suppress such activity.  See S.C. Res. 1851, U.N. Doc. S/RES/1851 (Dec. 16, 2008), S.C. Res. 1897, U.N. Doc. S/RES/1897 (Nov. 30, 2009) & S.C. Res. 1918, U.N. Doc. S/RES/1918 (Apr. 27, 2010), available at http://www.un.org/documents/scres.htm.  Now, as a result of such participation, and after a long lapse in the prosecution of piracy in the United States,[3] the Government has charged these Defendants,

---

[3]  Prior to 2009, the last prosecution in the United States for piracy appears to have been in the 1885 case of The Ambrose Light, 25 F. 408 (S.D.N.Y. 1885).  In 1922, however, a United

and others, with "piracy as defined by the law of nations," or, as it is also known, "general piracy," "piracy _jure gentium_," or "the international crime of piracy."[4]

In seeking dismissal of the piracy charge, Defendants challenge whether the acts alleged by the Government, namely the attack on the USS Nicholas, constitute piracy as defined by the law of nations. In short, Defendants contend that general piracy requires a robbery on the high seas, and that, because robbery requires the "taking" of property,[5] the Government's failure to allege any actual taking precludes a conviction for general piracy. By asserting that the Government has failed properly to allege the elements of the piracy charge contained in the Superseding

---

States court in the Philippine Islands affirmed an appeal from a piracy conviction in _United States v. Lol-Lo and Saraw_, 43 Phil. Rep. 19 (S.C. 1922) (Phil.). _See_ Alfred P. Rubin, _The Law of Piracy_ 347-48 & n.107 (2d ed. 1998) [hereinafter Rubin, _Law of Piracy_]; _see also id._ at 131-214 (providing a detailed discussion of the history of the crime of piracy in the United States). Last year, the Government prosecuted a Saudi national for alleged piracy, resulting in a guilty plea to a separate offense. _United States v. Muse_, No. 1:09-cr-00512 (S.D.N.Y. 2009). Also filed this year and pending in this District, and currently on appeal to the United States Court of Appeals for the Fourth Circuit, is a prosecution for alleged piracy involving an attack on the USS Ashland. _United States v. Said_, 2:10cr57 (E.D. Va. 2010).

[4] It is because of this long lapse in prosecution of piracy cases, and the recent increase in such cases, that this Opinion and Order sweeps broadly, providing a thorough discussion of all the issues presented.

[5] Unlawful taking is an element of robbery. _See, e.g._, _Scheidler v. Nat'l Org. for Women, Inc._, 547 U.S. 9, 21-22 (2006) (referencing statutes defining robbery as unlawful taking of personal property).

7

Indictment, Defendants present the Court with a straightforward question: what is the definition of piracy under the law of nations? To answer this question, the Court must first examine piracy's modern origins and historical development, in order to provide the proper backdrop for assessing the contours of general piracy under United States law. The most appropriate place to begin such an inquiry is with the nation's founding document, the source from which the Judiciary and the other branches of the United States government derive their authority to define, enforce, and adjudicate criminal offenses: the United States Constitution.

### A. The "Define and Punish" Clause

The Constitution provides that "[t]he Congress shall have Power . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. The "Define and Punish Clause" authorizes Congress to proscribe, and prescribe punishments for, three distinct sets of offenses: (1) "Piracies . . . committed on the high Seas," (2) "Felonies committed on the high Seas," and (3) "Offenses against the Law of Nations." United States v. Shi, 525 F.3d 709, 721 (9th Cir.), cert. denied, 129 S. Ct. 324 (2008) (citing United States v. Smith, 18 U.S. (5 Wheat.) 153, 158-59 (1820)). To comprehend fully the breadth of Congress's power to "define and punish Piracies," and discern the guiding principles by which any statute passed pursuant to such power must be

8

interpreted, it is important to examine the Framers' understanding of piracy at the time of the nation's founding, and review the unique characteristics that have for centuries distinguished piracy from all other crimes.

### 1. Piracy at the Founding

During the Constitutional Convention of 1787, it appears that the proposed Define and Punish Clause caused little excitement, and the modest debate that the clause did elicit concerned not the words "Piracies," "Felonies," or the "Law of Nations," but rather the meaning of "define" and "punish." Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U. L. Rev. 149, 162-164 (2009) [hereinafter Kontorovich, Define and Punish]; see also Rubin, Law of Piracy, supra, at 132-137 (discussing piracy at the Founding of the United States). Several delegates to the Constitutional Convention challenged the propriety of a single nation, particularly one in its infancy such as the United States, defining crimes that were necessarily determined by all nations. Kontorovich, Define and Punish, supra, at 163 & n.69 (citing 2 The Records of the Federal Convention of 1787, at 615 (Max Farrand ed., 1911)). Other delegates were concerned that using wording that was too restrictive would unnecessarily limit Congress to preexisting definitions of crimes falling within the scope of the clause. Kontorovich, Define and Punish, supra, at 163. In order to address

the concerns of delegates, the Constitutional Convention considered several variations on the Define and Punish Clause, including the suggested use of the words "designate" or "declare" to replace "define."   Id. at 162-63.   In the end, the words "define" and "punish" were apparently selected to empower Congress to proscribe crimes with an administrable level of certainty and make clear that international law, by its own force, did not create criminal liability in the United States.[6]   Id.

Notably, at the time of the nation's founding, "Pirac[y]" was generally considered to be both a type of "Felon[y] committed on the high Seas" and an "Offense[] against the Law of Nations."   Id. at 163-164.  With respect to felonies, while piracy was at one time distinguishable from felonies, because piracies were originally only triable under the civil law of admiralty, whereas felonies were cognizable only in common law courts, this distinction had long since ceased to exist by the Eighteenth Century.   Id. at 160-61.  With respect to offenses against the law of nations, the Framers understood the law of nations to consist of two chief components:   (1) "the general norms governing the behavior of national states with each other" and (2) "a body of judge-made law regulating the conduct of individuals situated outside domestic

---

[6]     Evidence of these discussions at the Constitutional Convention relating to the Define and Punish Clause can be found at 2 The Records of the Federal Convention of 1787, at 315-16 (Max Farrand ed., 1911).

boundaries and consequently carrying an international savor." Sosa v. Alvarez-Machain, 542 U.S. 692, 714-15 (2004). In addition, the law of nations contained "a sphere in which [the] rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships." Id. at 715. In the Eighteenth Century, this final overlapping sphere comprised three specific offenses: (1) "violation of safe conducts," (2) "infringement of the rights of ambassadors," and (3) "piracy." Id. (citing 4 William Blackstone, Commentaries *68).

Accordingly, as one commentator has noted, the Define and Punish Clause presents a double redundancy by pairing "Piracies" with "Felonies committed on the high Seas" and "Offences against the Law of Nations," the latter two categories being broader groupings of offenses within which piracy was already included. Kontorovich, Define and Punish, supra, at 163-65. The double redundancy contained in the Define and Punish Clause suggests that the Framers' viewed "Piracies" as a crime somehow distinct from both "Felonies committed on the high Seas" and "Offences against the Law of Nations." Id. at 164-65. The most obvious difference, and one that would have been readily apparent to the Framers, was that piracy on the high seas was a unique offense because it permitted nations to invoke universal jurisdiction, such that any country could arrest and prosecute pirates in its domestic courts, irrespective of the existence of a jurisdictional nexus. Id. at

165-67; see also 4 William Blackstone, Commentaries *71 (describing piracy, well before the Constitutional Convention, as an "offence against the universal law of society" such that, with respect to a pirate, "every community hath a right by the rule of self-defense, to inflict punishment upon him"). Indeed, by the Eighteenth Century, the international crime of piracy was well established as the only universal jurisdiction crime. Kontorovich, Define and Punish, supra, at 165; see also United States v. Robins, 27 F. Cas. 825, 862 (D.S.C. 1799) (No. 16,175) (discussing "piracy under the law of nations which alone is punishable by all nations . . . .") (quoting speech delivered by John Marshall to Congress).

The Define and Punish Clause therefore accords to Congress the special power of criminalizing piracy in a manner consistent with the exercise of universal jurisdiction.[7] Congress's execution of this power, however, has not been without considerable confusion.

---

[7] Although piracy was the only universal jurisdiction crime at the Founding, and thus the Define and Punish Clause unquestionably provides Congress the power to criminalize piracy subject to universal jurisdiction, Congress may arguably also be able to invoke universal jurisdiction for any "Offence[] against the Law of Nations" that (1) attains the same degree of condemnation that general piracy exhibits and (2) also meets the high hurdle of gaining near unanimous agreement that the offense should, as a procedural matter, be universally cognizable. See Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes, 93 Minn. L. Rev. 1191, 1223-27 (2009) [hereinafter Kontorovich, Beyond the Article I Horizon] (arguing that the assertion of universal jurisdiction in the Maritime Drug Law Enforcement Act exceeds Congress's power, in part, because nations do not agree that drug smuggling should be universally cognizable).

The confusion has stemmed largely from the fact that in enacting legislation pursuant to its authority to "define and punish Piracies," Congress has proscribed piracy as both a "municipal" crime, in violation of the laws of the United States, and as an international crime, in violation of the law of nations. Edwin D. Dickinson, Is the Crime of Piracy Obsolete?, 38 Harv. L. Rev. 334, 335-36 (1925) [hereinafter Dickinson, Obsolete] ("[Piracy] has long been regarded as an international crime as well as a crime by municipal law."). Significantly, whether a statute implemented by Congress condemns piracy as a municipal crime, or as a violation of the law of nations, has important implications for the exercise of universal jurisdiction. The Court therefore next considers the proscription of piracy as an offense against the law of nations versus the proscription of piracy as a crime against the municipal laws of the United States.

### 2. General Piracy and Municipal Piracy

As discussed above, the term "piracy" has been used over the years to describe two distinct offenses: (1) piracy as a violation of a nation's municipal laws (municipal piracy), and (2) piracy as a violation of the law of nations (general piracy). See, e.g., Kontorovich, Define and Punish, supra, at 166 ("[I]n addition to piracy under the law of nations, different nations made diverse offenses 'municipal' or 'statutory piracies.'"). While municipal piracy is flexible enough to cover virtually any overt act Congress

chooses to dub piracy, it is necessarily restricted to those acts that have a jurisdictional nexus with the United States. See Dole v. New Eng. Mut. Marine Ins. Co., 7 F. Cas. 837, 847 (Clifford, Circuit Justice, C.C.D. Mass. 1864) (No. 3,966) ("By statutes passed at various times . . . many artificial offences have been created which are to be deemed to amount to piracy . . . . [B]ut piracy created by municipal statute can only be tried by that state within whose territorial jurisdiction, on board of whose vessels, the offence thus created was committed."). In contrast, general piracy can be prosecuted by any nation, irrespective of the presence of a jurisdictional nexus. Sosa, 542 U.S. at 761-62 (Breyer, J., concurring) (quoting Smith, 18 U.S. at 162). However, because it is created by international consensus, general piracy is restricted in substance to those offenses that the international community agrees constitute piracy. Sosa, 542 U.S. at 761-62 (Breyer, J., concurring), see also United States v. Palmer, 16 U.S. (3 Wheat.) 610, 641-42 (1818) (Johnson, J., dissenting) ("[C]ongress cannot make that piracy which is not piracy by the law of nations, in order to give jurisdiction to its own courts over such offences.").

### a. Piracy as a Universal Jurisdiction Crime[8]

### i. Principles of Jurisdictional Sovereignty

Under international law principles, it is generally recognized that among the bases for jurisdiction, states are permitted to exercise criminal jurisdiction over conduct occurring within their own territory (the "territorial principle") and conduct committed by their own nationals outside of their own territory (the "nationality principle"). Restatement (Third) of Foreign Relations Law of the United States §§ 402(1)-(2) (1986) [hereinafter Restatement]; accord Blackmer v. United States, 284 U.S. 421, 437 (1932) (finding that the United States possesses inherent sovereign power to punish its nationals abroad for violations of United States law); The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 137 (1812) (discussing the "full and absolute territorial jurisdiction . . . of every sovereign"). States are further afforded criminal jurisdiction to proscribe conduct by foreign nationals occurring outside of their own territory if the conduct has a substantial effect within their territory (the "effects principle") or if the conduct is directed against a critical state interest (the "protective principle"). Restatement, supra, §

---

[8] Although universal jurisdiction does not need to be invoked in the instant case because Defendants are alleged to have attacked a United States Navy vessel, and therefore sovereignty and due process principles undoubtedly permit the Government to prosecute Defendants, the Court nevertheless reviews and considers general piracy's unique status as a universal jurisdiction crime as part of its assessment of the definition of general piracy.

402(1)(c), (3); accord United States v. Yousef, 327 F.3d 56, 110 (2d Cir. 2003) (applying the "protective principle" of jurisdiction to a defendant who planned to bomb United States commercial aircraft abroad); United States v. Aluminum Co. of Am., 148 F.2d 416, 443 (2d Cir. 1945) ("[A]ny state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends; and these liabilities other states will ordinarily recognize.").[9]

Having addressed the authority to exercise jurisdiction, it is also necessary to consider the application of such principles to the statutes of the United States. "It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) (quoting Foley Bros. v. Filardo, 336 U.S. 281, 284-85 (1949)), superseded on other grounds by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, § 109, 105 Stat. 1071. This canon of construction "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." EEOC, 499 U.S. at 248. In

---

[9] For useful discussions of criminal jurisdiction under international law, see Mark W. Janis, International Law (5th ed. 2008) [hereinafter Janis, International Law] & Ian Brownlie, Principles of Public International Law 299-304 (6th ed. 2003).

addition, some United States Courts of Appeals have held that
"'[i]n order to apply extraterritorially a federal criminal statute
to a defendant consistently with due process, there must be a
sufficient nexus between the defendant and the United States, so
that such application would not be arbitrary or fundamentally
unfair.'" Yousef, 327 F.3d at 111 (quoting United States v. Davis,
905 F.2d 245, 248 (9th Cir. 1990)); accord United States v.
Mohammad-Omar, 323 F. App'x 259, 261 (4th Cir.) (unpublished per
curiam opinion) (applying the nexus requirement to find no due
process violation in extraterritorial application of United States
drug laws), cert. denied, 130 S. Ct. 282 (2009); United States v.
Shahani-Jahromi, 286 F. Supp. 2d 723, 727-29 (E.D. Va. 2003)
(applying the due process nexus requirement where the defendant,
while in Iran, violated Virginia court orders by removing his
daughter from her mother's custody). But see United States v.
Suerte, 291 F.3d 366, 377 (5th Cir. 2002) (rejecting the nexus
requirement as part of the due process protection against
"arbitrary or fundamentally unfair" prosecution in cases arising
under the Maritime Drug Law Enforcement Act, 46 U.S.C. App'x §§
1901-04 ("MDLEA"));[10] accord United States v. Perez Oviedo, 281 F.3d

---

[10] In rejecting the nexus requirement for prosecutions under
the MDLEA, the court in Suerte found that because the MDLEA had
been passed pursuant to the Define and Punish Clause, Congress was
authorized to criminalize drug trafficking in a manner permitting
the assertion of universal jurisdiction. Suerte, 291 F.3d at
372-75. However, as discussed above, that analysis appears to
conflate the Constitution's grant of power to define and punish

17

400, 403 (3d Cir. 2002); <u>United States v. Cardales</u>, 168 F.3d 548, 553 (1st Cir. 1999); <u>United States v. Martinez-Hidalgo</u>, 993 F.2d 1052, 1054-57 (3d Cir. 1993).

### ii.  The Universal Jurisdiction Exception

Universal jurisdiction stands as a narrow and unique exception to the jurisdictional principles discussed above. Under the doctrine of universal jurisdiction, a state may "define and prescribe punishment for" any offense "recognized by the community of nations" as having "universal concern" even where there is no traditional basis for jurisdiction. Restatement, <u>supra</u>, § 404. Significantly, universal jurisdiction applies only to those crimes that the international community has universally condemned <u>and</u> has also agreed, as a procedural matter, deserve to be made universally cognizable. <u>See</u> <u>Sosa</u>, 542 U.S. at 761-62 (Breyer, J., concurring) (observing that "substantive uniformity does not <u>automatically</u> mean that universal jurisdiction is appropriate" for a particular crime, because there must also be "procedural agreement that universal

_____

general piracy, over which universal jurisdiction could be exercised, with its separate and distinct grant of power to define and punish "Felonies on the high Seas," over which universal jurisdiction could not be asserted. <u>United States v. Angulo-Hernandez</u>, 576 F.3d 59, 62 (1st Cir.) (Torruella, J., dissenting from denial of reh'g <u>en banc</u>) (discussing the United States Supreme Court's decision in <u>United States v. Furlong</u>, 18 U.S. (5 Wheat.) 184 (1820)), <u>cert. denied</u>, 130 S. Ct. 776 (2009); Kontorovich, <u>Beyond the Article I Horizon</u>, <u>supra</u>, at 1217-37 (arguing that the MDLEA exceeds Congress's power under the Define and Punish Clause because drug trafficking is neither piracy nor a universally cognizable crime under contemporary international law).

jurisdiction exists" over that crime). Moreover, because universal jurisdiction over a crime is established by international consensus, a state can only invoke universal jurisdiction for those acts that fall within the specific "subset of [universally condemned] behavior" that the international community has agreed warrants the assertion of universal jurisdiction. In short, a state's ability to invoke universal jurisdiction is inextricably intertwined with, and thus limited by, the substantive elements of the crime as defined by the consensus of the international community. See, e.g., Anthony J. Colangelo, The Legal Limits of Universal Jurisdiction, 47 Va. J. Int'l L. 149, 157-62 (2006) (discussing the "symbiosis" between the "prescriptive" and "adjudicative" authority afforded by universal jurisdiction).

### iii. Universal Jurisdiction over Piracy

The paradigmatic universal jurisdiction offense, and one that has been familiar to the international community for centuries, is the offense of general piracy.[11] See 1 Lassa Oppenheim, Oppenheim's International Law § 272 (Sir Robert Jennings, QC & Sir Arthur

---

[11] One commentator has asserted that, although piracy is afforded universal jurisdiction, there only appear to be approximately five known piracy prosecutions prior to 2009 in which the doctrine of universal jurisdiction was actually invoked. Rubin, Law of Piracy, supra, at 317 n.13, 326 n.50, 345 n.101 & 347 n.107. However, as another commentator points out, universal jurisdiction was likely invoked in many additional unreported cases, as well as summary proceedings conducted on the high seas. Eugene Kontorovich, The Piracy Analogy: Modern Universal Jurisdiction's Hollow Foundation, 45 Harv. Int'l L.J. 183, 192 n.51 (2004).

Watts, KCMG QC, eds., 9th ed. 1992) [hereinafter Oppenheim, International Law] ("[B]efore a Law of Nations in the modern sense of the term was in existence, a pirate was considered an outlaw, a 'hostis humani generis.' . . . Piracy is a so-called 'international crime;' the pirate is considered the enemy of every State, and can be brought to justice anywhere"); Eugene Kontorovich, The Piracy Analogy: Modern Universal Jurisdiction's Hollow Foundation, 45 Harv. Int'l L.J. 183, 190 (2004) [hereinafter Kontorovich, Piracy Analogy] ("For as long as sovereignty-based jurisdictional principles have existed (that is, at least since the early seventeenth century), any nation could try any pirates it caught, regardless of the pirates' nationality or where on the high seas they were apprehended.").

     As discussed above, however, a state can only invoke universal jurisdiction to prosecute general piracy against those acts that fall within the definition of general piracy tacitly or explicitly agreed upon by the members of the international community.[12] States are, of course, free to proscribe any number of acts as municipal "piracies," but to the extent that such acts do not also constitute

---

     [12] At least one commentator has suggested that "there is no substantive international law defining 'piracy' to be enforced by states directly," but only an "international law distributing the legal power to apply municipal law to the acts of foreigners," and thus "any international law relating to 'piracy'" is really "the legal power given to all states to apply their municipal laws to foreigners . . . injur[ing] the prescribing, enforcing and adjudicating state . . . under the general international law restricting 'standing.'" Rubin, Law of Piracy, supra, at 395.

general piracy, principles of customary international law preclude
states from availing themselves, in prosecuting such offenses, of
the universal jurisdiction that applies to prosecution of general
piracy. In other words, it is only when a state proscribes piracy
in a manner that mirrors the international consensus definition,
and prosecutes acts that fall within that definition, that the
state can assert the universal jurisdiction doctrine.[13]

Because of this need for United States law to reflect the
definition of general piracy agreed upon by the international

---

[13] In _United States v. Shi_, the United States Court of Appeals
for the Ninth Circuit refused to apply the nexus requirement,
articulated in its earlier decision in _Davis_, to the prosecution of
a foreign national who had taken control of a foreign vessel of
which he was a member of the crew, because it believed that the
charges against the defendant amounted to the international crime
of piracy. _Shi_, 525 F.3d at 722-24. The court reasoned that
because the international crime of piracy is universally
cognizable, the Government did not need to satisfy the otherwise
applicable nexus requirement necessary to ensure due process. _Id._
Significantly, however, in _Shi_, the Government did not charge the
defendant with general piracy, but rather with maritime violence,
in violation of 18 U.S.C. § 2280. _Id._ at 720. Therefore, to avail
itself of universal jurisdiction notwithstanding the absence of a
charge of general piracy, the Ninth Circuit held that the
allegations of maritime violence were essentially identical to
general piracy. _Id._ at 723-24. In its opinion, the Ninth Circuit
provided no specific analysis of whether general piracy includes
the violent seizure of a vessel by a member of its own crew (i.e.,
mutiny) or instead requires attacks by one ship against another.
The absence of such analysis suggests that the Ninth Circuit either
simply assumed that mutiny constituted general piracy or overlooked
the necessity of determining the international community's
consensus definition of general piracy before invoking universal
jurisdiction. _See_ Eugene Kontorovich, _United States v. Shi, 525
F.3d 709, cert. denied, 129 S. Ct. 324 (2008)_, 103 Am. J. Int'l L.
734 (2009) [hereinafter Kontorovich, _Shi_] (arguing that the Ninth
Circuit's decision in _Shi_ erred in finding that mutiny amounted to
general piracy in order to invoke universal jurisdiction).

community before universal jurisdiction could attach, initial attempts by Congress to criminalize the international crime of piracy proved difficult. Much of the difficulty stemmed from the then-unanticipated, but now well-established, rule that the federal courts of the United States have no common law jurisdiction in criminal matters; i.e., courts cannot develop judge-made criminal law. See Dickinson, Obsolete, supra, at 342 (arguing that Congress would have distinguished between municipal and general piracy more clearly if it had foreseen the absence of federal common law power to apply the law of nations); see also United States v. Hudson, 11 U.S. (7 Cranch) 32 (1812) (finding no federal court common law jurisdiction in criminal cases); United States v. Britton, 108 U.S. 199, 205-206 (1883). As a result, for a crime to be cognizable in the federal courts of the United States, the offense must be proscribed by an act of Congress. Accordingly, to charge a defendant with general piracy, the Government could not merely rely on the law of nations as part of domestic common law. Instead, Congress had to enact a municipal law that adequately embodied the international crime of piracy. As illustrated by the cases discussed below, the chief difficulty in accomplishing such a task was drafting legislation that was broad enough to incorporate the definition of piracy under the law of nations (and, in so doing, invoke universal jurisdiction) but narrow enough to exclude conduct that was beyond the scope of that definition.

22

### b. Justifications for Universal Jurisdiction

Although universal jurisdiction has been widely accepted in the context of piracy, there is considerable debate today over the expanded application of the doctrine to new international law crimes. Compare Henry A. Kissinger, The Pitfalls of Universal Jurisdiction, 80 Foreign Aff. 86 (2001) [hereinafter Kissinger, Pitfalls], with Kenneth Roth, The Case for Universal Jurisdiction, 80 Foreign Aff. 150 (2001) [hereinafter Roth, Universal Jurisdiction]. Because of recent controversy over the expansion of universal jurisdiction, it is important to understand how and why piracy is uniquely beyond the scope of such controversy. Indeed, since the end of the Second World War, it has been argued that, in addition to general piracy, the universal jurisdiction doctrine should apply to prosecutions of war crimes, apartheid, torture, genocide, terrorist activities, and other human rights violations. See generally Kenneth C. Randall, Universal Jurisdiction under International Law, 66 Tex. L. Rev. 785 (1988) (discussing the evolution of universal jurisdiction from piracy and slave trading to modern crimes against humanity).

The first major expansion of universal jurisdiction occurred with the prosecution of German war criminals in Nuremberg following the Second World War. E.g., id. at 801-10. Later, universal jurisdiction was also invoked to justify the seizure of Adolf Eichmann in Argentina and his subsequent prosecution in Israel in

23

1961 for Nazi atrocities committed against the Jewish people during the Second World War.  E.g., id. at 800-15.  More recently, universal jurisdiction was invoked in the 1998 British detention of former Chilean President Augusto Pinochet pursuant to a request for extradition by a Spanish judge for crimes against Spaniards in Chile.  E.g., Kissinger, Pitfalls, supra.

Those who support broader application of the universal jurisdiction doctrine argue that a system of international justice is an important tool for deterring despots and tyrants, who all too often act with impunity in their home states, from committing atrocities.  See, e.g., Roth, Universal Jurisdiction, supra, at 150 ("Impunity may still be the norm in many domestic courts, but international justice is an increasingly viable option, promising a measure of solace to victims and their families and raising the possibility that would-be tyrants will begin to think twice before embarking on a barbarous path.").  On the other hand, those who oppose an expanded use of universal jurisdiction are largely concerned about the lack of any limiting principle that would protect against the erosion of state sovereignty and injection of foreign courts into domestic political affairs.  They fear that one nation's expression of public policy could become another nation's crime.  See, e.g., Kissinger, Pitfalls, supra, at 86 (arguing that "any universal system should contain procedures not only to punish the wicked but also to constrain the righteous" and safeguard

24

against "legal principles [being] used as weapons to settle political scores").

It bears recognition that these arguments, presented in the debate over whether universal jurisdiction should cover modern international law offenses, are inapplicable to piracy. As noted above, piracy has for centuries been considered a universal jurisdiction crime based on international agreement, and, unlike the case with respect to modern universal jurisdiction crimes, there is little debate that all nations have authority to capture and punish any pirate. Yousef, 327 F.3d at 104; In re Piracy Jure Gentium, [1934] A.C. 586, 595 (1934) ("'The pirate is a sea brigand. He has no right to any flag and is justiciable by all.'") (quoting 2 John Bassett Moore, Digest of International Law 953 (1906)). Moreover, unlike modern universal jurisdiction crimes, which invoke the doctrine of universal jurisdiction on the basis of the offense's heinousness, piracy was the subject of universal jurisdiction because pirates were stateless actors, able to interfere with global commerce and navigation as a result of the difficulty inherent in policing the high seas. Yousef, 327 F.3d at 104 (piracy is universally punishable not because it is uniquely heinous, but instead "because of the threat that piracy poses to orderly transport and commerce between nations and because the crime occurs statelessly on the high seas"); see also Kontorovich, Implementing Sosa, supra, at 139-53 (discussing the reasons why

25

piracy was a universal jurisdiction crime). Indeed, heinousness does not appear to have been among the grounds justifying piracy's universal jurisdiction status. Privateering consisted of essentially the same acts as piracy, and was therefore no less heinous, but since it was done under the color of national authority, it was not treated as a universal jurisdiction crime. Kontorovich, Piracy Analogy, supra, at 210-23. Piracy instead received its unique jurisdictional status because pirates act outside of any nation's territorial jurisdiction, and without any nation's authority, to the detriment of every nation.

By comparison, modern universal jurisdiction crimes generally attempt to regulate wholly domestic behavior, such as a state's treatment of its own citizens, on the basis that the behavior is deplorable and violates fundamental human rights. See Abdullahi v. Pfizer, Inc., 562 F.3d 163, 203 (2d Cir. 2009) (Wesley, J., dissenting), cert. denied, 130 S. Ct. 3541 (2010). Modern universal jurisdiction crimes therefore implicate principles of state sovereignty that piracy does not by reaching into a state, without regard to any measures the state may wish to take within its own political process to address the alleged international crime, and punishing whomever the international community deems fit.

The foregoing analysis demonstrates that prosecuting piracy under the auspices of universal jurisdiction does not raise the

same state sovereignty concerns implicated by applying universal jurisdiction to modern international law offenses.  In contrast to such modern offenses, general piracy, by definition, occurs in areas to which the domestic political process of nations does not extend, involves parties who are not acting under the authority of any nation, and impacts every nation, even those whose vessels are not specifically targeted, by disrupting global commerce and imperiling navigation.

## B.   Legislative Implementation

Having examined the constitutional grant authorizing Congress to "define and punish Piracies," and the unique dual characterization of piracy as an offense against both municipal law and international law, the Court next reviews the legislation enacted by the United States Congress to proscribe piracy.  The most pertinent legislation relating to piracy consists of: (1) the Act of 1790; (2) the Act of 1819; (3) the Act of 1820; and (4) the more recent revisions of the earlier acts that are now embodied in Chapter 81 of Title 18 of the United States Code.  See generally Samuel Pyeatt Menefee, "Yo Heave Ho!": Updating America's Piracy Laws, 21 Cal. W. Int'l L.J. 151, 152–160 (1990) [hereinafter Menefee, Updating America's Piracy Laws] (discussing the history of piracy-related legislation in the United States).  The Court will briefly review each such piece of legislation in turn below.

### 1.  The Act of 1790

Congress enacted the first substantive piracy legislation in the Act of 1790.  The relevant portion of the Act of 1790, Section 8, provides:

> That if any person or persons shall commit upon the high seas, or in any river, haven, basin or bay, out of the jurisdiction of any particular state, murder or robbery, or any other offence which if committed within the body of a country, would by the laws of the United States be punishable with death; or if any captain or mariner of any ship or other vessel, shall piratically and feloniously run away with such ship or vessel, or any goods or merchandise to the value of fifty dollars, or yield up such ship or vessel voluntarily to any pirate; or if any seaman shall lay violent hands upon his commander, thereby to hinder and prevent his fighting in defence of his ship or goods committed to his trust, or shall make a revolt in the ship; every such offender shall be deemed, taken and adjudged to be a pirate and felon, and being thereof convicted, shall suffer death . . .

Act of Apr. 30, 1790, § 8, 1 Stat. 112.  The plain language of the Act applies to "any person or persons" on the high seas, and thus arguably was intended to proscribe general piracy in such a manner as to invoke universal jurisdiction.  In 1818, however, the United States Supreme Court rejected such a reading of the Act of 1790, and held that the Act did not apply to offenses committed by foreign nationals against foreign vessels:

> [T]he crime of robbery, committed by a person on the high seas, on board of any ship or vessel belonging exclusively to subjects of a foreign state, on persons within a vessel belonging exclusively to subjects of a foreign state, is not a piracy within the true intent and meaning of the act for the punishment of certain crimes against the United States.

28

Palmer, 16 U.S. at 633-34.  The very next year after this decision, Congress enacted a new piracy law in the Act of 1819.

## 2.  The Act of 1819

In response to the Supreme Court's interpretation of the Act of 1790 in Palmer, Congress passed the Act of 1819 to make clear that it wished to proscribe not only piratical acts that had a nexus to the United States, but also piracy as an international offense subject to universal jurisdiction.  The pertinent portion of the Act of 1819, Section 5, provides:

> That if any person or persons whatsoever, shall, on the high seas, commit the crime of piracy, as defined by the law of nations, and such offender or offenders, shall afterwards be brought into or found in the United States, every such offender or offenders shall, upon conviction thereof, before the circuit court of the United States for the district into which he or they may be brought, or in which he or they shall be found, be punished with death.

Act of March 3, 1819, ch. 77, 3 Stat. 510.  The Supreme Court interpreted § 5 of the 1819 Act just one year after its enactment in the seminal decision of United States v. Smith, 18 U.S. (5 Wheat.) 153 (1820).  Significantly, the effectiveness of the Act of 1819 was limited in duration to just one year, requiring supplemental legislation to prevent its provisions from expiring. See United States v. Corrie, 25 F. Cas. 658, 663 (C.C.D.S.C. 1860) (No. 14,869); accord Rubin, Law of Piracy, supra, at 158-159. One year after passing the Act of 1819, Congress extended § 5 of the

29

Act by passing the Act of 1820.  Corrie, 25 F. Cas. at 663; accord
Rubin, Law of Piracy, supra, at 158-159.

### 3.  The Act of 1820

In addition to extending § 5 of the Act of 1819, the Act of
1820 also notably condemned the slave trade as piracy, thereby
attaching the universal opprobrium piracy had attained to the slave
trade.  The pertinent portions of the Act of 1820—§§ 2, 4, and
5—provide:

Section 2:

That the fifth section of [the Act of 1819] be and the
same is hereby, continued in force, as to all crimes made
punishable by the same, and heretofore committed, in all
respects as fully as if the duration of the said section
had been without limitation.

Section 4 continues:

[I]f any citizen of the United States, being of the crew
or ship's company of any foreign ship or vessel engaged
in the slave trade, or any person whatever, being of the
crew or ship's company of any ship or vessel, owned in
the whole or part, or navigated for, or in behalf of, any
citizen or citizens of the United States, shall land,
from any such ship or vessel, and, on any foreign shore,
seize any negro or mulatto, not held to service or labour
by the laws of either of the states or territories of the
United States, with intent to make such negro or mulatto
a slave, or shall decoy, or forcibly bring or carry, or
shall receive, such negro or mulatto on board any such
ship or vessel, with intent as aforesaid, such citizen or
person shall be adjudged a pirate; and, on conviction
thereof . . . shall suffer death.

Section 5 continues:

That if any citizen of the United States, being of the
crew or ship's company of any foreign ship or vessel
engaged in the slave trade, or any person whatever, being
of the crew or ship's company of any ship or vessel,

30

owned wholly or in part, or navigated for, or in behalf of, any citizen or citizens of the United States, shall forcibly confine or detain, or aid and abet in forcibly confining or detaining, on board such ship or vessel, any negro or mulatto not held to service by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall, on board any such ship or vessel, offer or attempt to sell, as a slave, any negro or mulatto not held to service as aforesaid, or shall, on the high seas, or any where on tide water, transfer or deliver over, to any other ship or vessel, any negro or mulatto, not held to service as aforesaid, with intent to make such negro or mulatto a slave, or shall land, or deliver on shore, from on board any such ship or vessel, any such negro or mulatto, with intent to make sale of, or having previously sold, such negro or mulatto, as a slave, such citizen or persons shall be adjudged a pirate; and, on conviction thereof . . . shall suffer death.

Act of May 15, 1820, §§ 2, 4-5, 3 Stat. 600.

### 4. Subsequent Modification

Many of the piracy provisions contained in the above-listed congressional enactments have been codified by Congress in Title 18, Chapter 81 of the United States Code. See Menefee, Updating America's Piracy Laws, supra, at 161-170 (discussing the history of Chapter 81). Indeed, the statute at the heart of the instant case, 18 U.S.C. § 1651, is nearly identical to its precursor, § 5 of the Act of 1819. The only significant difference between 18 U.S.C. § 1651 and § 5 of the Act of 1819 is the penalty prescribed: the former substitutes mandatory life imprisonment for death, the mandatory penalty prescribed by the latter. 18 U.S.C. § 1651. In addition, Chapter 81 proscribes piracy in the "municipal" sense by dubbing various acts as piracy even though they may not necessarily

31

fall within the definition of general piracy recognized by the international community. For example, 18 U.S.C. § 1652 criminalizes certain conduct as municipal piracy when committed by citizens of the United States, including acts of hostility on the high seas. Section 1652 provides:

> Whoever, being a citizen of the United States, commits any murder or robbery, or any act of hostility against the United States, or against any citizen thereof, on the high seas, under color of any commission from any foreign prince, or state, or on pretense of authority from any person, is a pirate, and shall be imprisoned for life.

18 U.S.C. § 1652. Section 1653 of Title 18 further proscribes certain conduct as municipal piracy when committed by aliens, by stating:

> Whoever, being a citizen or subject of any foreign state, is found and taken on the sea making war upon the United States, or cruising against the vessels and property thereof, or of the citizens of the same, contrary to the provisions of any treaty existing between the United States and the state of which the offender is a citizen or subject, when by such treaty such acts are declared to be piracy, is a pirate, and shall be imprisoned for life.

18 U.S.C. 1653. Lastly, Chapter 81 criminalizes attacks to plunder a vessel in 18 U.S.C. § 1659. Section 1659 was originally enacted as part of the Act of 1825, and today provides:

> Whoever, upon the high seas or other waters within the admiralty and maritime jurisdiction of the United States, by surprise or open force, maliciously attacks or sets upon any vessel belonging to another, with an intent unlawfully to plunder the same, or to despoil any owner thereof of any moneys, goods, or merchandise laden on board thereof, shall be fined under this title or imprisoned not more than ten years, or both.

32

18 U.S.C. § 1659.  With these statutes in mind, the Court next considers the case law applying that statutory language.

## C. **United States Case Development Preceding 18 U.S.C. § 1651**

It appears that the first Supreme Court decision interpreting a congressional enactment relating to piracy was _Palmer_, which was quickly followed by _Smith_.  No other Supreme Court decision since _Smith_ has directly addressed the definition of general piracy.  In order to understand current law regarding piracy, it is important to understand these cases.

### 1. **United States v. Palmer**

In _Palmer_, the defendants, some of whom were United States nationals and some of whom were foreign nationals, were accused of attacking and capturing a Spanish vessel while on the high seas. 16 U.S. at 611.  The defendants were later apprehended in the United States and charged with piracy under § 8 of the Act of 1790. _Id._ at 612.  On certification from the circuit court, the Supreme Court was presented with the question of whether § 8, which proscribed as piracy "robbery" and "murder" committed by "any person or persons" on the high seas, could be applied against foreign nationals on board foreign vessels who had acted only against other foreign nationals.  _Id._ at 613.  The Court concluded that the Act of 1790 had not proscribed piracy as an offense against international law, and therefore found that the Government could not invoke universal jurisdiction to prosecute acts committed

33

by foreign nationals against other foreign nationals under § 8. Id. at 633-34.

In reaching that conclusion, Chief Justice John Marshall, writing for the Court, explained that although the words "any person or persons" used in the Act of 1790 suggested that the Act had "unlimited extent," the Court nevertheless had to look to broader congressional intent to determine whether the Act was truly meant to extend to foreign nationals. Id. at 631. As evidence of congressional intent, the Court first looked to the title of the 1790 Act, which read: "an act for the punishment of certain crimes against the United States." Id. The Court found that such language suggested that § 8 aimed to criminalize only acts committed against the United States and not acts that were crimes against humanity generally. Id. The Court next looked for congressional intent in the text of the Act of 1790 itself. The Court noted that the phrase "any person or persons" appeared to extend § 8's provisions to acts committed by foreign nationals, but found that the remaining statutory language showed that Congress had intended to limit § 8 only to crimes by or against United States citizens. Id. at 632. Specifically, § 8 made a "captain or mariner" who ran away with a ship, or a "seaman" who shall "lay violent hands upon his commander," pirates. Id. at 632. The Court held that these latter two provisions, which fall outside of general piracy and are instead traditionally proscribed by each

34

state's municipal law, demonstrated that the entirety of § 8 should be read not to apply to foreign nationals who commit acts against foreign vessels or their crews. <u>Id.</u> at 633.

In short, because the Act of 1790 used the terms "any person or persons" with respect to offenses that did not fall within the traditional definition of general piracy under international law, the Court reasoned that the entire Act, including its proscription against robbery on the high seas, should be applied only to offenses against the United States. Accordingly, the Court read the Act of 1790 narrowly, construing it not to proscribe the international crime of piracy, which is typically afforded universal jurisdiction.

### 2. <u>United States v. Smith</u>

In <u>Smith</u>, the defendant and other members of a crew mutinied, confined the officer of the vessel (which was commissioned by the government of Buenos Ayres [sic]) while in port, seized a second vessel commissioned by the government of Artigas, and, while on the high seas, plundered and robbed the vessel. 18 U.S. at 154. The defendant was later captured and charged with piracy under § 5 of the Act of 1819, which, unlike the Act of 1790, explicitly proscribed piracy as defined by the law of nations. The question before the Court in <u>Smith</u> was whether Congress had properly and sufficiently exercised its authority under the Constitution to define and punish piracies by relying on the law of nations for a

definition of piracy in § 5.  _Id._ at 158.  The Supreme Court answered that question in the affirmative, stating that, by incorporating the definition of piracy under the law of nations, Congress had defined piracy as clearly as if it had penned the elements of the offense itself.  _Id._ at 158-162.

Justice Story, writing for the Court, began the analysis in _Smith_ by observing that piracy can either be defined by municipal laws or by the law of nations.  _Id._ at 159 (citing _The Federalist No. 42_ (James Madison)).[14]  When piracy is defined by the law of nations, the Court continued, it is no less clear what Congress has proscribed than if Congress had decided to expressly list the elements of the offense.  _Id._ at 159-60.  In reaching this conclusion, the Court found that relying on "the law of nations" for a definition of piracy was no different than having to rely on the common law to understand what "malice aforethought" means in the proscription of murder.  _Id._ at 160.  The Court concluded that the constitutional grant of authority to Congress to define piracies required Congress to "enumerate the crimes which shall constitute piracy; and this may be done, either by a reference to crimes having a technical name, and determinate extent, or by enumerating the acts in detail upon which the punishment is inflicted."  _Id._

---

[14]  Wheaton incorrectly cites _The Federalist No. 4_.

Having concluded that Congress sufficiently executed its authority to define and punish piracy in proscribing piracy by reliance on an outside source with a determinate meaning, the Court next set out to determine whether "piracy as defined by the law of nations," in fact, had such a determinate meaning. Id. at 160-62. To ascertain how the law of nations defined piracy, the Court consulted "the works of jurists, writing professedly on public law . . . the general usage and practice of nations . . . [and] judicial decisions recognising and enforcing [the law of nations on piracy]." Id. at 160-61. After listing a bevy of sources discussing piracy under the law of nations, the Court found that "whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, animo furandi, is piracy."[15] Id. at 161. Accordingly, the Court concluded that because piracy under the law of nations was "robbery upon the sea," § 5 of the Act of 1819 "sufficiently and constitutionally" defined piracy by expressly incorporating the definition of piracy under the law of nations. Id. at 162.

---

[15] The Latin term animo furandi means "with the intent to steal." Black's Law Dictionary 86-87 (7th ed. 1999).

### D.  Foreign Case Law[16]

The most significant foreign case dealing with the question of how piracy is defined under international law is <u>In re Piracy Jure Gentium</u>, [1934] A.C. 586 (1934).  In that case, the Privy Council[17] of England addressed the question of whether an attack on a vessel that does not result in an actual taking of property constitutes the offense of general piracy.  <u>Id.</u> at 586.  The underlying case arose from a failed attack on a Chinese cargo vessel by armed Chinese nationals cruising in two Chinese junks.  <u>Id.</u> at 587.  The Chinese nationals chased and fired upon the cargo vessel for nearly an hour.  <u>Id.</u>  Eventually, with the aid of fellow merchant ships and the British Navy, the Chinese nationals were apprehended.  <u>Id.</u> The defendants were thereafter brought before the Court of Hong Kong and indicted for piracy.  <u>Id.</u>

Following trial, a jury found the defendants guilty of piracy, subject to the resolution by the Full Court of Hong Kong of whether

---

[16]  While the Court is mindful of the controversy regarding reference to judicial decisions of other countries, those concerns are not applicable where Congress has specifically chosen to define a crime by reference to the "law of nations."

[17]  The Privy Council served an important role in the English government by linking the legal systems of the Commonwealth countries, the Empire, and the United Kingdom itself.  Roget V. Bryan, <u>Toward the Development of a Caribbean Jurisprudence:  The Case for Establishing a Caribbean Court of Appeal</u>, 7 J. Transnat'l L. & Pol'y 181, 183 (1998).  The Privy Council served, in part, as an appeals court from the local courts in the various colonies of the British Empire.  <u>Id.</u> at 184.  The Privy Council also reviewed disputed legal questions referred to it by the Crown and recommended resolutions for such questions.  <u>Id.</u> at 183-84.

a failed attack, in which no actual robbery occurred, constituted the offense of general piracy. Id. at 588. The Full Court of Hong Kong concluded that robbery was a necessary element to support conviction for piracy, and the defendants were acquitted. Id. The Crown referred to the Privy Council the question of whether a failed attack not actually resulting in a robbery formed the crime of piracy. Id. The Privy Council concluded that "[a]ctual robbery is not an essential element in the crime of piracy jure gentium. A frustrated attempt to commit a piratical robbery is equally piracy jure gentium." Id.

In concluding that the international crime of piracy does not require a completed act of robbery, the Privy Council reviewed numerous sources, including, among other things, treatise writers, English case law, and decisions by the federal courts of the United States. Id. at 588-600. The Privy Council noted that while several cases referred to piracy as "robbery on the high seas," those cases most logically had to be read in light of the facts presented in them, which invariably involved a classic case of piracy, namely, an attack upon, and capture of, another vessel. Id. at 591, 596. Moreover, while noting that two prominent cases, the 1696 English trial R. v. Dawson, 13 St. Tr. col. 451, and the 1820 United States Supreme Court decision in Smith, 18 U.S. at 153, at least in part supported the proposition that piracy required robbery, the Privy Council observed that two more recent decisions

of the same two countries, namely, <u>The Serhassan Pirates</u>, (1844) 2 How. 210, and <u>The Ambrose Light</u>, 25 F. at 408, supported the conclusion that general piracy included acts of violence without an actual taking. <u>In re Piracy Jure Gentium</u>, [1934] A.C. at 597-98. Lastly, the Privy Council relied on the 1926 work on the matter by the League of Nations. <u>Id.</u> at 599. The League's sub-committee on the codification of international law had reported that "piracy consists in sailing the seas for private ends without authorization from the government of any State with the object of committing depredations upon property or acts of violence against persons." <u>Id.</u>[18]

After examining the question in detail, the Privy Council concluded that there existed "a gradual widening of the earlier definition of piracy." <u>Id.</u> at 600. Accordingly, even if the earliest opinions on the definition of general piracy required robbery as an element of the international offense, the Privy Council found that as of 1934, if not earlier, general piracy had come to include acts of violence committed on the high seas, even without any actual taking. <u>Id.</u>

The most recent case on this issue outside the United States of which this Court is aware is <u>Ahmed v. Republic</u>, Crim. App. Nos. 198, 199, 201, 203, 204, 205, 207 & 207 of 2008 (H.C.K. May 12,

---

[18]    Depredation is defined as "The act of plundering; pillaging." <u>Black's Law Dictionary</u> 453 (7th ed. 1999).

2009) (Azangalala, J.), in which ten Somali suspects captured by the United States Navy on the high seas were convicted of piracy. The Kenyan Penal Code criminalized piracy both in Kenya's territorial waters and on the high seas, providing that "[a]ny person who, in the territorial waters or upon the high seas, commits any act of piracy jure gentium is guilty of the offence of piracy." Ahmed, at 9 (citing Kenyan Penal Code § 69(1)); see also James Thuo Gathii, Jurisdiction to Prosecute Non-National Pirates Captured By Third States Under Kenyan and International Law, 31 Loy. L.A. Int'l & Comp. L. Rev. 363, 372 (2009) [hereinafter Gathii, Jurisdiction]. The trial court had found that piracy jure gentium was "a crime with international dimensions." Republic v. Ahmed, Crim. No. 434 of 2006, at 155 (Chief Mag. Ct. Nov. 1, 2006) (Jaden, Acting Sr. Principal Mag.)); see also James Thuo Gathii, Agora: Piracy Prosecution, Kenya's Piracy Prosecutions, 104 Am. J. Int'l L. 416, 423 (2010) [hereinafter Gathii, Kenya]. "Describing piratical acts as including violence, detention, and the causing of harm or damage, the court invoked the definition of piracy under Article 101 of the LOS Convention for the proposition that the law consists of those acts." Republic, at 155. On appeal, the High Court affirmed the Principal Magistrate's Court, stating:

> I must hold that the Learned Principal Magistrate was bound to apply the provisions of the [LOS] Convention should there have been deficiencies in our Penal Code and Criminal Procedure Code.

41

> I would go further and hold that even if the Convention had not been ratified and domesticated, the Learned Principal Magistrate was bound to apply international norms and Instruments since Kenya is a member of the civilized world and is not expected to act in contradiction to expectations of member states of the United Nations.

Ahmed, at 10-11 (citing Martin Dixon, <u>Textbook on International Law</u> 76-77 (1990)).[19]

### E.   Treaties

In addition to the developments in United States and foreign law discussed above, there are two prominent international agreements that have directly addressed, and defined, the crime of general piracy.[20]   First, in 1958, the United Nations adopted the

---

[19]   The High Court also used the 1982 United Nations Convention on the Law of the Sea ("UNCLOS"):

> to affirm the existence of universal jurisdiction over piracy as an independent basis for exercising jurisdiction over non-Kenyan nationals charged with committing offenses on the high seas.   Thus, international law, rather than domestic law, is involved not simply to fill a statutory gap or to help in interpreting a statute but as a legal justification establishing the piracy jurisdiction of Kenyan courts over non nationals who had committed the offense extraterritorially and been captured by foreign forces.

Gathii, <u>Kenya</u>, <u>supra</u> at 424-25.

[20]   While the 1958 Geneva Convention on the High Seas and UNCLOS directly define general piracy, there are other widely ratified criminal law treaties that clarify or seek to address real and perceived gaps in the law of piracy.   J. Ashley Roach, <u>Agora: Piracy Prosecutions, Countering Piracy Off Somalia: International Law and International Institutions</u>, 104 Am. J. Int'l L. 397, 406 (2010) [hereinafter Roach, <u>Prosecutions</u>].   Chief among these is the Convention on the Suppression of Unlawful Acts against the Safety of Maritime Navigation, March 10, 1988, S. Treaty Doc. No. 101-1 (1989), 1678 U.N.T.S. 222 (the "SUA Convention").   <u>See</u> Eugene Kontorovich, <u>"A Guantánamo on the Sea": The Difficulty of</u>

Geneva Convention on the High Seas (the "High Seas Convention").
The High Seas Convention used as its starting point The Harvard
Research in International Law Draft Convention on Piracy, 26 Am. J.
Int'l L. 743 (1932), which sought to catalogue all judicial
opinions on piracy and codify the international law of piracy.
Rubin, Law of Piracy, supra, at 335, 349.   Today the High Seas
Convention has a total of 63 states parties, including the United
States.[21]  Article 15 of the High Seas Convention provides that:

> Piracy consists of any of the following acts:
>
> (1) Any illegal acts of violence, detention or any act of
> depredation, committed for private ends by the crew or
> the passengers of a private ship or a private aircraft,
> and directed:
>
>> (a) On the high seas, against another ship or
>> aircraft, or against persons or property on board
>> such ship or aircraft;
>>
>> (b) Against a ship, aircraft, persons or property
>> in a place outside the jurisdiction of any State;
>
> (2) Any act of voluntary participation in the operation
> of a ship or of an aircraft with knowledge of facts
> making it a pirate ship or aircraft;

---

Prosecuting Pirates and Terrorists, 98 Cal. L. Rev. 243, 254-55
(2010) [hereinafter Kontorovich, Guantánamo] (noting that the SUA
Convention "partially overlaps with UNCLOS and existing
international law concerning piracy"); Milena Sterio, The Somalia
Piracy Problem:  A Global Puzzle Necessitating A Global Solution,
59 Am. U. L. Rev. 1449, 1467 (2010) [hereinafter Sterio, Global
Puzzle] (discussing debate as to whether acts of maritime terrorism
for political ends are covered by UNCLOS and explaining how SUA's
universal jurisdiction authorization directly covers terrorism).

[21]   The United States became a signatory in 1958, and ratified
the convention in 1961.   United Nations Treaty Collection (2010),
http://treaties.un.org (last visited October 19, 2010).

(3) Any act of inciting or of intentionally facilitating
an act described in subparagraph 1 or subparagraph 2 of
this article.

Geneva Convention on the High Seas art. 15, Apr. 29, 1958, 13
U.S.T. 2312, 450 U.N.T.S. 397.

Second, in 1982, the United Nations adopted the United Nations
Convention on the Law of the Sea ("UNCLOS"). An overwhelming
majority of the world, 161 states, are parties to UNCLOS. Somalia
became a signatory in 1982, and ratified and/or acceded in 1989.
United Nations Website, http://www.un.org/Depts/los/convention_
agreements/convention_overview_convention.htm (last visited Oct.
19, 2010). The United States, however, has not signed or ratified
UNCLOS, because of its disagreement with the deep seabed regime set
out in Part XI of the Convention.[22]  1 Thomas J. Schoenbaum,
Admiralty and Maritime Law § 2-2 (4th ed. 2004) [hereinafter
Schoenbaum]. Nevertheless, the United States has accepted as
customary international law the treaty provisions dealing with
"traditional uses" of the sea. Id.

Article 101 of UNCLOS provides that:

Piracy consists of any of the following acts:

(a) any illegal acts of violence or detention, or any act
of depredation, committed for private ends by the crew or

---

[22] In 1994, the United States signed the subsequently adopted
Agreement Relating to the Implementation of Part XI of the United
Nations Convention on the Law of the Sea of 10 December, 1982, 13
I.L.M. 1309 (1994), which amended the deep seabed regime in Part XI
of UNCLOS. Schoenbaum, supra, § 2-2.

the passengers of a private ship or a private aircraft, and directed:

> (i) on the high seas, against another ship or aircraft, or against persons or property on board such ship or aircraft;
>
> (ii) against a ship, aircraft, persons or property in a place outside the jurisdiction of any State;

(b) any act of voluntary participation in the operation of a ship or of an aircraft with knowledge of the facts making it a pirate ship or aircraft;

(c) any act of inciting or of intentionally facilitating an act described in subparagraph (a) or (b).

United Nations Convention on the Law of the Sea art. 101, Dec. 10, 1982, 1833 U.N.T.S. 397. Therefore, a comparison of the two treaties reveals that UNCLOS defines piracy in exactly the same terms as the 1958 High Seas Convention, with only negligible stylistic changes, and represents the most recent international statement regarding the definition and jurisdictional scope of piracy. In addition, it should be noted that Article 105 of UNCLOS provides:

> On the high seas, or in any other place outside the jurisdiction of any State, every State may seize a pirate ship or aircraft, or a ship or aircraft taken by piracy and under the control of pirates, and arrest the persons and seize the property on board. The courts of the State which carried out the seizure may decide upon the penalties to be imposed, and may also determine the action to be taken with regard to the ships, aircraft or property, subject to the rights of third parties acting in good faith.

Id. at art. 105. Article 105 of UNCLOS thus reaffirms the continued applicability of universal jurisdiction in the

45

prosecution of piracy.[23] With this historical backdrop in mind, the Court turns to the parties' arguments.

## IV. DISCUSSION

Count One of the Superseding Indictment charges Defendants with piracy as defined by the law of nations, in violation of 18 U.S.C. § 1651. Defendants move to dismiss Count One pursuant to Rule 12 of the Federal Rules of Criminal Procedure. Defendants specifically contend that Count One should be dismissed because the allegations in the Superseding Indictment, even if proven true, do not constitute the offense of piracy as defined by the law of nations. In short, Defendants assert that general piracy requires an actual robbery on the high seas, and that the Superseding Indictment fails to allege any "taking" by Defendants constituting robbery. The Government, in turn, admits that Defendants are not alleged to have taken any property, but argues that dismissal is unwarranted because the definition of general piracy includes an armed assault on another ship without an actual taking of property. Accordingly, before measuring the allegations contained in the Superseding Indictment against the elements of 18 U.S.C. § 1651,

---

[23]    It should be noted that there are conflicting views on whether Article 105 purports to provide jurisdiction to states other than the capturing state. Compare Gathii, Jurisdiction, supra, at 375 (arguing that only the capturing state has jurisdiction), with Roach, Prosecutions, supra, at 404 (enunciating a broader view of jurisdiction).

the Court must determine the definition of piracy under the law of nations.

## A.  Piracy Under the Law of Nations in the Nineteenth Century

Defendants argue that the authoritative definition of piracy under the law of nations, and thus within the meaning of 18 U.S.C. § 1651, is provided by the Supreme Court's decision in Smith.  In interpreting the Act of 1819, the Supreme Court in Smith stated that piracy as defined by the law of nations was "robbery upon the sea."  18 U.S. at 162.  Defendants contend that, because the Government has failed to allege that they committed any actual robbery on the high seas, the piracy charge pending against them must be dismissed.  In response, the Government asserts that Smith neither foreclosed the possibility that piracy included conduct other than robbery nor precluded the possibility that the definition of piracy under the law of nations might later come to include conduct other than robbery.

In Smith, the Supreme Court held that Congress "sufficiently and constitutionally" proscribed the offense of piracy in the Act of 1819 by expressly incorporating the definition of piracy under the law of nations.  18 U.S. at 162.  After consulting "writer[s] on the law of nations," the Court declared that "whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, animo furandi, is piracy."  Id. at 161.  Notably, the facts in

47

Smith constituted a classic case of piracy, in which the defendant attacked and captured a Spanish vessel while cruising the high seas. Id. at 154. Consequently, it is difficult to know whether the Court's rendering of the definition of general piracy was limited by the facts of the case before it, or whether the definition of general piracy that it provided was instead intended to be exhaustive.

Some subsequent decisions suggest that the Supreme Court's decision in Smith provided an exhaustive definition of piracy. See, e.g., United States v. Furlong, 18 U.S. (5 Wheat.) 184, 197 (1820) (decided the same year as Smith, and explaining that murder is not piracy under international law and observing in dicta that "[r]obbery on the seas is considered as an offence within the criminal jurisdiction of all nations."); Davison v. Seal-Skins, 7 F. Cas. 192, 193-94 (Thompson, Circuit Justice, C.C.D. Conn. 1835) (No. 3,661) (noting in the context of a salvage case that "[a] pirate is one who acts solely on his own authority, without any commission or authority from a sovereign state, seizing by force, and appropriating to himself, without discrimination, every vessel he meets with; and hence pirates have always been compared to robbers."). In addition to the cases cited above, some recent decisions by United States Courts of Appeals also reference piracy, but in non-criminal contexts. For example, in Taveras v. Taveraz, 477 F.3d 767, 772 n.2 (6th Cir. 2007), the court addressed an

analogy to piracy in a parental child abduction tort suit under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). The Taveras court rejected the analogy, noting that a "fundamental element of the offense of piracy is that the acts of robbery or depredation must have been committed upon the high seas." Id. Finding that the events giving rise to the parental child abduction action did not occur on the high seas, the court rejected the argument that piracy could form the basis of jurisdiction in the ATS claim before it. The definition of piracy, other than its high seas requirement, was clearly not the subject of the case, and the reference to robbery is therefore of little assistance to this Court.

In United States v. Madera-Lopez, 190 F. App'x 832, 836 (11th Cir. 2006) (unpublished per curiam opinion), the court considered a criminal defendant's plain error argument that the MDLEA, pursuant to which he was charged, "is unconstitutional because Congress's Article I powers do not encompass the authority to punish drug trafficking among stateless vessels on the high seas." Id. at 834 (internal quotation marks omitted). In resolving the issue of "whether MDLEA's enactment exceeded Congress's authority under the 'Piracies and Felonies Clause,'" the court looked to Smith. Id. at 836. Noting that the Smith court "declared that 'piracy, by the law of nations, is robbery upon the sea, and that it is sufficiently and constitutionally defined by the fifth section of the act of 1819'" the court concluded that "even if

*Smith* . . . stands for the proposition that the Piracies and Felonies Clause creates distinct grants of power for defining and punishing piracy and felonies, it does not impact the result in this case." *Id.* Again, just as in *Taveras*, the definition of general piracy was not the subject of the case; the grant of power was the issue. Therefore, the reference to "robbery upon the sea" in *Madera-Lopez* is of little assistance to the Court.

Moreover, other federal cases suggest that the definition of general piracy under the law of nations may include acts other than robbery, such as mere violence. For example, in *The Chapman*, a case involving the civil forfeiture of a schooner fitted to cruise under the flag of the Confederate States, the Northern District of California interpreted an Act providing for seizure of any vessel involved in "any piratical aggression, search, depredation, or seizure, or in the commission of any other act of piracy, as defined by the laws of nations." 5 F. Cas. 471, 472 (N.D. Cal. 1864) (No. 2,602). Although the case involved civil forfeiture, rather than criminal liability, the court interpreted the Act to permit forfeiture only for those acts that are piracy under the law of nations. *Id.* In assessing whether the vessel in question had been involved in general piracy, the court observed:

> A pirate, under the laws of nations, is an enemy of the human race. Being the enemy of all, he is liable to be punished by all. Any act which denotes this universal hostility, is an act of piracy. Not only an actual robbery, therefore, but cruising on the high seas without commission, and with intent to rob, is piracy.

The Chapman, 5 F. Cas. at 474 (quoting a speech of John Marshall before his appointment as Chief Justice of the United States). The Chapman court ultimately concluded that, although violent acts committed with the intent to rob constitute general piracy, the acts alleged in the case were not piratical under the law of nations because they were committed under color of the authority of the Confederate States. Id. at 476.

In 1864, another federal court held that "[a]ctual robbery on the high seas is piracy under the law of nations by all authorities, and so is the act of cruising upon the seas without a commission and with the intent to rob." Dole, 7 F. Cas. at 847. Furthermore, in The Ambrose Light, the District Court for the Southern District of New York declared that there can be "[n]o doubt [that] indiscriminate violence and robbery on the high seas are piracy." 25 F. at 423 (citing Smith, 18 U.S. at 161) (emphasis added).

Whether Smith was limited to its facts and not intended to be exhaustive, or whether its description of piracy was exhaustive but only represented the definition of piracy accepted at that time by the international community, if the definition of piracy under the law of nations can evolve over time, such that the modern law of nations must be applied, rather than any recitation of the state of the law in the early Nineteenth Century, there is no need to conclusively determine the contours of Smith.

51

### B.   Can the Definition of Piracy Evolve?

Although the Government argues in the instant case that piracy under the law of nations in 1820 included acts of violence without an actual taking, it also argues that whatever the definition of piracy was in 1820, contemporary authorities sufficiently demonstrate that the international community today defines piracy more broadly than "robbery on the high seas."   In response, Defendants argue that because criminal statutes must be interpreted according to their meaning when written, the phrase "law of nations," as used in 18 U.S.C. § 1651, cannot evolve and, consequently, the authoritative (and exhaustive) definition of general piracy is provided by <u>Smith</u>.

As explained more fully below, the Court concludes that both the language of 18 U.S.C. § 1651 and Supreme Court precedent indicate that the "law of nations" connotes a changing body of law, and that the definition of piracy in 18 U.S.C. § 1651 must therefore be assessed according to the international consensus definition at the time of the alleged offense.   Therefore, as suggested above, the Court need not conclusively determine the exact contours of the <u>Smith</u> opinion.

### 1.   Statutory Language

The language of 18 U.S.C. § 1651 demonstrates that Congress clearly sought by enacting it to incorporate within its proscription of the international crime of piracy any subsequent

developments in the definition of general piracy under the law of nations.  The general piracy statute, 18 U.S.C. § 1651, provides "[w]hoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life."  18 U.S.C. § 1651.  Significantly, in making piracy as defined by the law of nations triable in the federal courts, Congress chose not to crystallize the contours of general piracy, but opted instead to define the crime by reference to the "law of nations."  Id.

The plain language of 18 U.S.C. § 1651 reveals that, in choosing to define the international crime of piracy by such a reference, Congress made a conscious decision to adopt a flexible—but at all times sufficiently precise—definition of general piracy that would automatically incorporate developing international norms regarding piracy.  Accordingly, Congress necessarily left it to the federal courts to determine the definition of piracy under the law of nations based on the international consensus at the time of the alleged offense.  See Ex Parte Quirin, 317 U.S. 1, 29-30 (1942) (finding that by providing jurisdiction for military commissions to try persons for violations of the "law of war," Congress decided against "crystallizing in permanent form and in minute detail every offense against the law of war," but rather authorized courts to recognize applicable offenses) (emphasis added).

53

Further evidence that 18 U.S.C. § 1651's reference to the "law of nations" contemplates the application of a flexible definition for general piracy can be gleaned from the history of the statute's passage. Notably, the decision by Congress to define piracy by reference to the "law of nations" instead of by explicit definition of the meaning of general piracy at the time was driven by the Supreme Court's interpretation of the Act of 1790 in Palmer. 16 U.S. at 610. See generally United States v. Chapels, 25 F. Cas. 399 (C.C.D. Va. 1819) (No. 14,782) (discussing the history of Act of 1819) & Corrie, 25 F. Cas. at 663; see also Rubin, Law of Piracy, supra, at 158 ("The immediate result of U.S. v. Palmer in the halls of the Congress was the passage of [the Act of 1819] . . . .").

The Act of 1790 made various offenses crimes, including murder, assault by members of a crew against their captain, and robbery, when committed by "any person or persons" on, among other places, the high seas. Act of Apr. 30, 1790, § 8, 1 Stat. 112. Arguably, as discussed above, by making the Act of 1790 applicable to "any person or persons," Congress intended to proscribe the international crime of piracy, and thereby invoke universal jurisdiction for prosecutions of alleged acts of piracy perpetrated by foreign nationals against foreign vessels with no nexus to the United States. The Supreme Court, however, rejected such a reading, holding instead that the Act of 1790 did not provide

54

universal jurisdiction because the legislation defined piracy too broadly, including offenses other than robbery that were not understood to provide a basis for invoking universal jurisdiction, such as murder and assaults against captains by their crew. Palmer, 16 U.S. at 630-634.  Just one year later, in the Act of 1819, it appears that Congress sought to address the Palmer decision, and ensure that general piracy would be cognizable in the federal courts, by defining piracy according to its definition under the "law of nations."  Act of Mar. 3, 1819, § 5, 3 Stat. 510. It seems inescapable that this was the result of Congress recognizing that, with respect to the definition of general piracy, it could only keep pace with, and not force, international consensus.  See Kontorovich, Beyond the Article I Horizon, supra, at 1215-17 (discussing congressional restraint in applying universal jurisdiction to violation of slave trade restrictions).

This historical backdrop demonstrates that to proscribe the international crime of general piracy in a manner consistent with the exercise of universal jurisdiction, any statute making such a crime cognizable in the federal courts must define general piracy in such a way as to mirror the international consensus definition of piracy under the law of nations.  Congress therefore cannot unilaterally proscribe an act as general piracy sufficient to invoke universal jurisdiction with a mere stroke of its legislative pen when the law of nations does not so define the act as such.

Implicit in this recognition is the notion that Congress cannot control the contours of general piracy, and that developing international norms may alter the offense's accepted definition, albeit at a glacial pace. Accordingly, rather than having to revise the general piracy statute continually to ensure that it continued to mirror the international consensus definition, Congress merely decided to define piracy by explicit reference to the law of nations, such that any future change in the definition of general piracy under the law of nations would be automatically incorporated into United States law.[24]

Lastly, reading 18 U.S.C. § 1651 to require that federal courts apply a definition of general piracy that is sufficiently

---

[24] Defendants argue that the scope of general piracy under 18 U.S.C. § 1651 has not expanded since Smith, pointing to Congress's 1948 revision of Title 18. E.g., Docket No 86 at 8. At the time, Congress grouped the then-existing piracy and piracy-related offenses together, but made no substantive changes to the piracy statute. Defendants note that, according to a report issued by the United States House of Representatives' Judiciary Committee at the time, the "1948 Act was merely re-codifying the existing domestic piracy law, notwithstanding any international developments regarding the law of piracy." Id. (citing H.R. Reg. No. 80-304, at A112 (1947)). Defendants further argue that language of the House Report, which made its way into the revision notes preceding Chapter 81 of the United States Code, "acknowledge[s] [that] the nation's piracy law has not changed since 1819" Docket No. 86 at 9. This argument misses the point. The language referenced in the revision note applies to the entire Chapter. However, § 1651 is the only section within the Chapter that refers to the law of nations, and it thus already contains, in the form of that reference, a mechanism that effects revision. Therefore, to say that the revision note acknowledges that the United States' piracy law has not changed since 1819 requires a leap in logic as it relates to § 1651. Accordingly, the Court finds this argument unavailing.

flexible to recognize developments in the law of nations is also commanded by principles of fundamental fairness. Significantly, interpreting 18 U.S.C. § 1651 to necessitate application of the 1820 definition of general piracy could result in the prosecution of acts that no longer are considered offenses against the law of nations. The dangers apparent in employing such a "snapshot" approach to the definition of general piracy are not merely theoretical.

For instance, the international crime of piracy in 1820 only applied to acts committed outside of the three-mile boundary demarcating a nation's territorial waters from the international high seas. See 1 Oppenheim, International Law, supra, § 277; United States v. Rubies, 612 F.2d 397, 402 n.2 (9th Cir. 1979) (noting that, traditionally, the high seas lie seaward of the three-mile territorial sea); Alfred P. Rubin, Revising the Law of "Piracy", 21 Cal. W. Int'l L.J. 129, 134 (1990) (observing that the facts of the Lol-Lo and Saraw case in the Philippines did not actually fall within the definition of general piracy under the law of nations because the alleged acts occurred within three miles of shore). In 1820, sea robbery occurring within a nation's territorial waters could therefore only be prosecuted under that nation's municipal laws, and not pursuant to the law of nations' prohibition of the crime of piracy. Such a rule makes sense in light of piracy's condemnation as an offense that disrupted global

commerce, which in 1820 naturally was dependent on the ability to sail freely across international waters.

Unlike in 1820, territorial waters today are commonly considered to extend not three, but twelve, miles from a nation's shore. See Janis, International Law, supra, at 222-28 (discussing the change from three-mile to twelve-mile territorial seas). Arguably, therefore, to commit the international crime of general piracy today, an individual must act beyond the twelve-mile territorial sea boundary. As a result, if the definition of general piracy in 18 U.S.C. § 1651 is unable to change with international developments, individuals could be prosecuted in the United States for offenses occurring outside of the three-mile boundary applicable in 1820, but within the twelve-mile boundary applicable today. See Kontorovich, Guantánamo, supra, at 253 (arguing that fighting piracy today is more difficult following the extension of the traditional three-mile high seas zone to twelve miles). Yet to prosecute as general piracy those acts occurring between three and twelve miles would contradict the notion that Congress cannot define general piracy in a manner contrary to its definition under the law of nations. Moreover, permitting the prosecution of acts that have ceased to be violations of the law of nations would be fundamentally unfair, and is decidedly unnecessary in light of the language utilized by Congress in 18 U.S.C. § 1651.

## 2.  Supreme Court Case Law on the Nature of the Law of Nations

The conclusion that 18 U.S.C. § 1651 requires courts to apply the contemporary definition of general piracy under the law of nations is further supported by Supreme Court precedent.  Each of the cases discussed below demonstrates that use of the phrase "law of nations" contemplates a developing set of international norms.

### a.  Sosa v. Alvarez-Machain

In Sosa v. Alvarez-Machain, the Supreme Court considered whether the Alien Tort Statute, permitted an alien to pursue a civil action alleging an offense against the law of nations.  542 U.S. at 692.  Sosa stemmed from the 1985 torture and murder of a Drug Enforcement Administration ("DEA") agent while he was on assignment in Mexico.  Id. at 697.  The DEA came to believe that a Mexican physician, Humberto Alvarez-Machain ("Alvarez"), aided in the torture and murder by prolonging the agent's life.  Id.  After the Mexican government refused to extradite Alvarez for prosecution in the United States, DEA officials, with the help of Mexican national Jose Francisco Sosa ("Sosa"), abducted Alvarez and brought him to the United States to stand trial.  Id. at 698.  The trial ended after the Government presented its case and the district court granted Alvarez's motion for a judgment of acquittal.  Id. After returning to Mexico, Alvarez filed suit in the United States against various persons involved in his arrest, including Sosa, alleging violations of the law of nations under the ATS.  Id.

59

The question before the Supreme Court was whether Alvarez's claim of "arbitrary detention" was an offense under the law of nations cognizable in the federal courts of the United States. The Court noted that the First Congress provided, by means of the ATS, that district courts "shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations." 28 U.S.C. § 1350. After declaring the ATS to be largely a jurisdictional statute, the Sosa Court went on to conclude that the ATS provided "a cause of action for the modest number of international law violations with a potential for personal liability at the time" of its enactment, namely the three offenses recognized by Blackstone: (1) violation of safe conducts, (2) infringement of the rights of ambassadors, and (3) piracy. Id. at 745.

Significantly, the Sosa Court added that nothing in the ATS or subsequent congressional action precluded federal courts from exercising their responsibility to recognize (but not create) new causes of action based on the "present-day law of nations." Id. at 725. In assessing whether Alvarez's ATS claim, namely that the parties involved in his abduction had violated a modern international prohibition against "arbitrary detention," was cognizable in the federal courts, the Supreme Court compared the characteristics of "arbitrary detentions" against "historic paradigms familiar when [the ATS] was enacted." Id. at 732 (citing

Smith, 18 U.S. at 163-180 & n.a). In the end, the Court concluded that the offense of "arbitrary detention" was not an offense recognized by customary international law, and therefore did not represent an actionable claim under the ATS. Id. at 735-38.

Sosa makes clear that, while the offenses against the law of nations extant at the time of the First Congress are clearly cognizable under the ATS in the federal courts, "new norms of international character accepted by the civilized world" may also become cognizable in the federal courts. Id. at 726. Sosa therefore represents an explicit recognition by the Supreme Court that the phrase "law of nations" in legislative enactments contemplates an evolving body of international law. Certainly, if the phrase "law of nations" permits federal courts to recognize new international offenses that were not considered such by the First Congress, it must equally be within the federal courts' authority to recognize any developments in well-established offenses against the law of nations. See Filartiga v. Pena-Irala, 630 F.2d 876, 881 (2d Cir. 1980) (finding that, in the context of the ATS, "it is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today"). While Sosa recognized that the phrase "law of nations" in the ATS contemplated an evolving body of international law, it is worth noting that the accepted role of federal courts in determining whether an alleged offense is cognizable under the law

of nations for purposes of the ATS requires the exercise of
significantly more discretion than in the context of 18 U.S.C. §
1651, where Congress has already proscribed the offense of general
piracy and left only the elements (as accepted by an overwhelming
majority of countries) to be discerned by the courts.[25]

### b. United States v. Arjona

The Supreme Court's earlier decision in United States v.
Arjona, 120 U.S. 479 (1887), further demonstrates that the "law of
nations" has long been understood to be an evolving body of law.
Beth Stephens, Federalism and Foreign Affairs: Congress's Power to
"Define and Punish . . . Offenses Against the Law of Nations", 42
Wm. & Mary L. Rev. 447, 478 (2000) [hereinafter Stephens,
Federalism]. In Arjona, the Government prosecuted the defendant
for violating a federal statute that prohibited the counterfeiting
of notes issued by foreign government-owned banks. 120 U.S. at
480. On appeal, the defendant challenged the constitutionality of
the federal statute. Id. at 482-83. The question before the Court

---

[25]    In Sosa, a minority of the Court joined Justice Scalia's
concurrence, which strongly objected to the conclusion that federal
courts could pronounce wholly new offenses without an express
delegation of such power from Congress. Sosa, 542 U.S. at 739-51
(Scalia, J., dissenting). Those concerns are simply not implicated
by the question currently before this Court because, by enacting 18
U.S.C. § 1651, Congress expressly recognized the international
offense of general piracy, made it triable in the United States,
and delegated to the federal courts responsibility for
determination of its definition.

was whether the Constitution authorized Congress to criminalize the counterfeiting of foreign notes within the United States.   Id.

In answering the question, the Supreme Court turned to the Define and Punish Clause of the Constitution, recognizing its grant to Congress of the power to "define and punish . . . Offenses against the Law of Nations."[26]   Id. at 483.   The Court observed:

> The law of nations requires every national government to use 'due diligence' to prevent a wrong being done within its own dominion to another nation . . . and because of this, the obligation of one nation to punish those who, within its own jurisdiction, counterfeit the money of another nation has long been recognized.

Id. at 484.   Relying on the work of international law scholar Emmerich de Vattel, the Court found that, at least with respect to currency, it had long been recognized that for one nation to permit the counterfeiting of another nation's money would do the other nation great harm.   Id. at 484.   Because this principle had been widely accepted among nations, it was deemed a part of the law of nations.   Id.

Significantly, unlike currency, government-owned securities were almost unknown at the time of the founding of the United States.   Id. at 485.   As a result, the special protection under the law of nations against the counterfeiting of another nation's

---

[26]   The constitutional provision granting Congress the power to punish counterfeiting did not apply because it only extends to "the Securities and current Coin of the United States."   Stephens, Federalism, supra, at 478 n.114 (quoting U.S. Const. art. I, § 8, cl. 6).

currency did not apply to the counterfeiting of another nation's government-owned securities. Id. Nevertheless, the Court concluded that the universal protection against counterfeiting currency "extended to" the "recent custom among bankers of dealing in foreign securities." Id. at 486. Therefore, the Supreme Court recognized that the use of securities had become so prevalent that they had accrued the protections previously afforded only to currency under the law of nations. The Court's decision in Arjona thus also demonstrates that the law of nations can change to reflect developments in international norms.

### c. The Antelope

At the start of the Nineteenth Century, amidst a rising tide of outrage at the evils of the slave trade, the United States sought to implement measures that would bring about its end. Kontorovich, Define and Punish, supra, at 194-95. In an aggressive effort to denounce the trade, Congress declared the slave trade a form of piracy in the Act of 1820. Id. at 194. The Act of 1820 provided that "any citizen of the United States" who participated in the slave trade, or "any person whatever" who served as a member of the crew of a slave ship owned by a citizen of the United States, would be "adjudged a pirate" and "suffer death." Act of May 15, 1820, ch. 113, §§ 4-5, 3 Stat. 600, 600-01.

Significantly, although the Act of 1820 included the slave trade under the umbrella of piracy, by limiting its application to

those with a nexus to the United States, Congress implicitly recognized that it could not provide for the invocation of universal jurisdiction to prosecute such a crime, as it had done for general piracy, until such time as the slave trade had become generally accepted by the world as an offense under the law of nations. Kontorovich, Define and Punish, supra, at 194-95. This conclusion is bolstered by the fact that only two years earlier, in Palmer, the Supreme Court had struck down the piracy statute before it on the grounds that general piracy subject to universal jurisdiction must not have been intended, because its language reflected an intention that it only apply where a United States nexus was present. Congress therefore clearly understood that requiring a United States nexus would negate the availability of universal jurisdiction. Nevertheless, it is believed that by linking the slave trade to the universally condemned offense of piracy, Congress sought to "catalyze a progressive development in the law of nations" that would, over the course of time, result in the slave trade becoming an offense against the law of nations. Id. at 195; accord Rubin, Law of Piracy, supra, at 163 ("[U]se of the word 'piracy' in connection with the international slave trade presumably represents an attempt . . . to develop the international law . . . by changing the municipal law of the United States . . . and hoping that other states in the international legal order would follow suit.").

In _The Antelope_, the Supreme Court considered the legality of the slave trade under international law, and examined whether it had attained the status of an offense against the law of nations such that universal jurisdiction would attach to it.  23 U.S. (10 Wheat.) 66, 68 (1825).  The case arose after Spain and Portugal brought suit in federal court seeking restitution for slaves seized from aboard slave ships bearing their nations' flags, including one Spanish vessel named The Antelope, by United States cruisers sailing off of the African coast.  _Id._  Notably, the case involved foreign ships, and no nexus to the United States existed.  _Id._ at 123.  In seeking freedom for the slaves, the United States Government asserted that the slave trade was an offense against the law of nations and, in any event, was also prohibited as piracy under the laws of the United States.  _Id._ at 71-81.  Spain and Portugal opposed the seizure of the slaves, arguing that their ships were participating in legitimate commerce and were not subject to the laws of the United States.  _Id._ at 81-100.

The Supreme Court, Chief Justice Marshall writing, ruled in favor of the Spanish and Portugese claimants.  _Id._ at 132.  In examining the question of whether the slave trade had become universally condemned, the Court stated that a jurist must look to "those principles of action which are sanctioned by the usages, the national acts, and the general assent, of that portion of the world of which he considers himself as a part, and to whose law the

66

appeal is made." Id. at 122. After reviewing the history of slavery, reciting several foreign cases addressing the condemnation of the slave trade, and noting the unfortunate role both Europe and America had played in perpetuating the practice, the Court concluded that, despite recent efforts to denounce it, the practice of the slave trade was not a violation of international law because it was virtually "sanctioned by universal consent." Id. at 115-22. The Court further found that because the slave trade was "consistent with the law of nations, it [could not] in itself be piracy" as that offense was understood in the international community. Id. at 122. Accordingly, the only way that the slave trade could be proscribed as piracy, when the law of nations did not define it as such, was by the passage of municipal laws, which could not "transcend the legislative power of the state" that had enacted the law. Id.

Significantly, however, the Court went on to consider how a so-called universally recognized right, such as the slave trade, could be lost. Id. In doing so, the Court signaled that the law of nations could change over time. Anthony J. Colangelo, Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law, 48 Harv. Int'l L.J. 121, 140 (2007). In answering its own question, the Court held that "[a] right . . . which is vested in all by the consent of all, can be divested only by consent." The Antelope, 23

67

U.S. at 122. The Court thus clearly recognized that something that is not yet a violation of the law of nations could, through developments over time, become illegal.

Accordingly, Congress's foray into categorizing the slave trade as piracy and the Supreme Court's decision in The Antelope both indicate that, even in the early Nineteenth Century, it was already well established that the law of nations was a developing body of law and, more importantly, that the definition of general piracy could change. See United States v. La Jeune Eugenie, 26 F. Case. 832, 846 (Story, Circuit Justice, C.C.D. Mass. 1822) ("It does not follow . . . that because a principle cannot be found settled by the consent or practice of nations at one time, it is to be concluded, that at no subsequent period the principle can be considered as incorporated into the public code of nations.").

### d. The Definition of Piracy Can Evolve

In view of the statutory language chosen by Congress in enacting the general piracy statute at issue in this case, and the Supreme Court case law examining the meaning of the "law of nations," the Court concludes that the phrase "law of nations," as used in 18 U.S.C § 1651, requires application of the modern international consensus definition of general piracy. Doing so, however, does not mean that courts are somehow creating law. Instead, it means only that courts are recognizing that which has already been accepted by an overwhelming majority of countries as

68

the definition of general piracy, and courts must be careful to do so only when it is, in fact, clear that an overwhelming majority of countries have definitively accepted such a definition. In exercising such care, courts assuage concerns about the clarity of the definition of proscribed conduct for defendants facing prosecution.

## C. Piracy Under the Law of Nations in the Twenty-First Century

Having concluded that Congress's proscription of "piracy as defined by the law of nations" in 18 U.S.C. § 1651 necessarily incorporates modern developments in international law, the Court must next discern the definition of piracy under the law of nations at the time of the alleged offense in April 2010. Although the proliferation of international organizations and multilateral agreements has significantly altered the nature of international law in the modern era, the process by which the definition of piracy under the law of nations is to be assessed is not markedly different today from what is was some two hundred years ago. See Kiobel v. Royal Dutch Petroleum Co., Nos. 06-4800-cv & 06-4876-cv, 2010 WL 3611392, at *11–12 (2d Cir. Sept. 17, 2010) (citing, inter alia, Smith for the list of sources courts should consult in assessing customary international law). Accordingly, the Court follows the path first laid out by the Supreme Court in Smith, and acknowledged in subsequent decisions, to determine the modern definition of piracy under the law of nations.

69

### 1.  Customary International Law

During the Eighteenth and early Nineteenth Centuries, the "law of nations" was recognized as a "system of rules, deducible by natural reason, and established by universal consent among the civilized inhabitants of the world; in order to . . . insure the observance of justice and good faith, in that intercourse which must frequently occur between two or more independent states, and the individuals belonging to each."  4 William Blackstone, Commentaries *66. As a result, in the context of general piracy, the law of nations was best "ascertained by consulting the works of jurists, writing professedly on public laws; or by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law." Smith, 18 U.S. at 160-61.  This approach was later reaffirmed when the Supreme Court relied on a similar set of sources to conclude that the prohibition against seizure of an enemy's coastal fishing vessels had ripened into an international legal rule proscribed by the law of nations. See The Paquete Habana, 175 U.S. 677, 686, 700 (1900) (relying on "customs and usages of civilized nations" as evidenced by the works of learned "jurists and commentators" to find a gradually ripening international rule prohibiting the seizure of enemy fishing vessels).

Today, "the law of nations has become synonymous with the term 'customary international law,' which describes the body of rules

that nations in the international community 'universally abide by, or accede to, out of a sense of legal obligation and mutual concern.'"[27] Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 116 (2d Cir. 2008), cert. denied, 129 S. Ct. 1524 (2009) (quoting Flores v. S. Peru Copper Corp., 414 F.3d 233, 248 (2d Cir. 2003)); Restatement, supra, § 102(2) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation."). As is the case with the law of nations, customary international law "does not stem from any single, definitive, readily-identifiable source," but rather is derived from "myriad decisions made in numerous and varied international and domestic arenas." Flores, 414 F.3d at 247-48. Customary international law is therefore best understood as "a kind of international common law." Al-Bihani v. Obama, 619 F.3d 1, 17 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of reh'g en banc). In summarizing these principles, the Supreme Court in Sosa observed that for a practice to attain the status of a rule of customary international law such that it could be

---

[27]   A norm need not literally be implemented by every member of the international community in order to be "universally" accepted for purposes of becoming a rule of customary international law.   Indeed, such a high hurdle to the creation of customary international law would eliminate the need for customary international law altogether, because all nations would have to be bound by formal conventions before a rule of customary international law could develop.   Under such circumstances, customary international law would have no role left to play. Flores, 414 F.3d at 248.

cognizable in the federal courts, the practice must (1) "rest on a norm of international character accepted by the civilized world," and (2) be "defined with a specificity comparable to the features of the 18th-century paradigms."[28]  _Sosa_, 542 U.S. at 725.

In the absence of a controlling treaty, statute or judicial decision, customary international law, as its name suggests, is most aptly revealed by resorting:

> to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat.  Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

_Kiobel_, 2010 WL 3611392, at *11-12 (quoting _Sosa_, 542 U.S. at 733-34); _see also_ _Dow Chem. Co._, 517 F.3d at 116 (stating that customary international law is discerned through the sources articulated in _Smith_, namely, "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law") (quoting _Filartiga_, 630 F.2d at 880)).

These principles were recently summarized by the United States Court of Appeals for the Second Circuit in _Kiobel_.  There, the

---

[28]  As previously noted, the paradigmatic offenses against the law of nations were described by Blackstone as (1) violation of safe conducts, (2) infringement on the rights of ambassadors, and (3) piracy.  _Sosa_, 542 U.S. at 715.

Second Circuit observed that the principal sources of international law relevant to assessing whether a norm has become a rule of customary international law are:

> (1) "international conventions, whether general or particular, establishing rules expressly recognized by contesting states";
>
> (2) "international custom, as evidence of a general practice accepted as law";
>
> (3) "the general principles of law recognized by civilized nations";
>
> (4) "judicial decisions and the teachings of the most highly qualified publicists [i.e., scholars or "jurists"] of the various nations, as <u>subsidiary means for the determination of rules of law</u>."

<u>Kiobel</u>, 2010 WL 3611392, at *12 (quoting Statute of the International Court of Justice, art. 38, June 26, 1945, 59 Stat. 1055, 1060, 33 U.N.T.S. 993) (emphasis added by the <u>Kiobel</u> court); <u>see also</u> Restatement, <u>supra</u>, § 103 (listing similar sources as evidence of international law).

As a final point, it should be kept in mind, when looking at the pre-1938 case law on these issues, that customary international law was once considered to be part of the general federal common law, and therefore automatically applicable in the federal courts of the United States. <u>See The Paquete Habana</u>, 175 U.S. at 700 (1900) (stating that "[i]nternational law is part of our law"). However, the view that international law is part of the domestic law of the United States has been questioned after the Supreme Court renounced general federal common law in <u>Erie R. Co. v.</u>

73

Tompkins, 304 U.S. 64, 79 (1938). See, e.g., Al-Bihani, 619 F.3d at 17 (Kavanaugh, J., concurring in denial of reh'g en banc) (characterizing the "notion, common in the early years of the Nation . . . that international law was part of the general common law that federal courts could apply" as "now discredited") (citing, inter alia, Sosa, 542 U.S. at 714-15); but see Sosa, 542 U.S. at 729-30 (explaining that "Erie did not in terms bar any judicial recognition of new substantive rules . . . and post-Erie understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way" and citing, inter alia, The Paquete Habana for the proposition that "[f]or two centuries we have affirmed that the domestic law of the United States recognizes the law of nations"); Restatement, supra, § 111 ed. n.3; see generally Louis Henkin, Foreign Affairs and the United States Constitution 136-41 & 408-14 nn.16-41, 236-46 & 508-13 nn.15-36 (2d ed. 1996); Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 671-79 (6th ed. 2009). Nevertheless, when Congress enacts a statute that expressly incorporates customary international law into the domestic law of the United States, the federal courts are required, as with any other constitutional congressional mandate, to follow the statutory language adopted by Congress and apply customary international law. See Al-Bihani, 619 F.3d at 17 (Kavanaugh, J., concurring in denial

of reh'g en banc) ("Customary-international-law norms become part of domestic U.S. law only if the norms are incorporated into a statute or self-executing treaty."). Significantly, by proscribing piracy in 18 U.S.C. § 1651 pursuant to its definition under "the law of nations," Congress created just such a statute, requiring the federal courts to look to customary international law. 18 U.S.C. § 1651.

## 2. Piracy as Customary International Law

The Court next examines the relevant sources of evidence of customary international law to determine what, if any, definition of piracy exists under international law today. Defendants point to the writings of several scholars in arguing that there is no consensus definition of piracy under modern international law. The Court finds that the evidence supports a conclusion to the contrary. As of April 1, 2010, the law of nations, also known as customary international law, defined piracy to include acts of violence committed on the high seas for private ends without an actual taking. More specifically, the Court finds that the definition of general piracy under modern customary international law is, at the very least, reflected in Article 15 of the 1958 High Seas Convention and Article 101 of the 1982 UNCLOS. Because UNCLOS (1) contains a definition of general piracy that is, for all

75

practical purposes, identical[29] to that of the High Seas Convention,
(2) has many more states parties than the High Seas Convention, and
(3) has been much more widely accepted by the international
community than the High Seas Convention, the Court finds that the
definition of piracy in UNCLOS reflects the current state of
customary international law for purposes of interpreting 18 U.S.C.
§ 1651.

### a.  The High Seas Convention and UNCLOS

"Treaties 'are proper evidence of customary international law
because, and insofar as, they create legal obligations akin to
contractual obligations on the States parties to them.'"  Kiobel,
2010 WL 3611392, at *17 (quoting Flores, 414 F.3d at 256) (emphasis
in original omitted); see also Restatement, supra, § 102(3)
("International agreements . . . may lead to the creation of
customary international law when such agreements are intended for
adherence by states generally and are in fact widely accepted.").
While all treaties shed some light on the customs and practices of
a state, "'a treaty will only constitute sufficient proof of a norm
of customary international law if an overwhelming majority of
States have ratified the treaty, and those States uniformly and
consistently act in accordance with its principles.'"  Kiobel, 2010
WL 3611392, at*17 (quoting Flores, 414 F.3d at 256.).   In this

---

[29] The difference between the two agreements lies merely in the
removal of a comma and the addition of the word "or" between
"violence" and "detention" in subpart "a" of Article 101 of UNCLOS.

regard, it is also important to understand that a treaty can either "embod[y] or create[] a rule of customary international law," and such a rule "applies beyond the limited subject matter of the treaty and to nations that have not ratified it." Kiobel, 2010 WL 3611392, at *18 (citing 1 Oppenheim, International Law, supra, § 626, at 1261). Such "'law-making treaties' . . . codify existing norms of customary international law or crystalize an emerging rule of customary international law." Kiobel, 2010 WL 3611392, at *18 (citing 1 Oppenheim, International Law, supra, § 583, at 1203-04 as "discussing 'law-making' treaties").

> For a treaty provision to attain the status of a norm of customary international law . . . "[i]t would in the first place be necessary that the provision concerned should, at all events potentially, be of a fundamentally norm-creating character such as could be regarded as forming the basis of a general rule of law."

Kiobel, 2010 WL 3611392 at *19 (quoting North Sea Continental Shelf Case, [1969] 8 I.L.M. 340, 374).

There were 63 states parties to the High Seas Convention as of June 10, 2010, including the United States, and there were 161 states parties to UNCLOS (including the European Union) as of October 5, 2010, including Somalia.[30] The 161 states parties to

---

[30] Defendants argue that the significance of the accession by the United States to the High Seas Convention is diminished by the fact that implementing legislation was never adopted by Congress. While such an assertion might have been relevant if the Court had accepted Defendants' argument that the elements of Section 1651 were written in stone by Smith, and could therefore only be amended by subsequent congressional action, it does not diminish the wide acceptance of the general piracy definition by the international

UNCLOS represent the "overwhelming majority" of the 192 Member States of the United Nations, and the 194 countries recognized by the United States Department of State. Press Release, United Nations Dep't of Pub. Info., United Nations Member States, U.N. Press Release ORG/1469 (July 3, 2006), <u>available at</u> http://www.un.org/News/Press/docs/org1469.doc.htm; Bureau of Intelligence and Research, U.S. Dep't of State, Independent States of the World, Fact Sheet, (July 29, 2009), <u>available at</u> http://www.state.gov/s/inr/rls/4250.htm. UNCLOS's definition of piracy therefore represents a widely accepted norm, followed out of a sense of agreement (or, in the case of the states parties, treaty obligation), that has been recognized by an overwhelming majority of the world.

The status of UNCLOS as representing customary international law is enhanced by the fact that the states parties to it include all of the nations bordering the Indian Ocean on the east coast of Africa, where the incident in the instant case is alleged to have taken place: South Africa, Mozambique, Tanzania, Kenya, and Somalia. <u>See</u> <u>Kiobel</u>, 2010 WL 3611392, at *17 (noting that a treaty's evidentiary value for assessing customary international law depends on the number of parties and the parties' relative influence on the international issue) (citing <u>Flores</u>, 414 F.3d at

---

community for purposes of determining whether such definition has become customary international law.

78

256-57). Also significant in determining whether UNCLOS constitutes sufficient proof of a norm of customary international law is the fact that both the United States and Somalia, two countries that clearly have an influence on the piracy issue, have each ratified, and thus accepted, a treaty containing the exact same definition of general piracy.

Moreover, although the definition of general piracy provided by the High Seas Convention and UNCLOS is not nearly as succinct as "robbery on the sea," the definitions are not merely general aspirational statements, but rather specific enumerations of the elements of piracy reflecting the modern consensus view of international law. Accordingly, UNCLOS's definition of general piracy has a norm-creating character and reflects an existing norm of customary international law that is binding on even those nations that are not a party to the Convention, including the United States. Kiobel, 2010 WL 3611392, at *17-19.

### b. International Custom and General Principles of Law

The fact that the United States has not signed or ratified UNCLOS does not change the conclusion reached above regarding its binding nature. While the United States' failure to sign or ratify UNCLOS does bar the application of UNCLOS as treaty law against the United States, it is not dispositive of the question of whether UNCLOS constitutes customary international law, because such a determination relies not only on the practices and customs of the

79

United States, but instead of the entire international community.
In any event, while the United States has refused to sign UNCLOS
because of Part XI's regulations related to deep seabed exploration
and mining, in 1983, President Ronald Reagan announced that the
United States would accede to those provisions of UNCLOS pertaining
to "traditional uses" of the ocean. Schoenbaum, supra, § 2-2
("With respect to the 'traditional uses' of the sea, therefore, the
United States accepts [UNCLOS} as customary international law,
binding upon the United States."). No succeeding Presidential
Administration has taken a contrary position. See U.S. Sen.
Richard G. Lugar, Address at the Brookings Institution (May 4,
2004) (available at http://www.brookings.edu/speeches/2004/
0504energy_lugar.aspx?p=1 (last visited October 20, 2010) (noting
that every Presidential Administration from Ronald Reagan to George
W. Bush stated that it would accept and act in accordance with the
provisions of UNCLOS except those relating to deep seabed mining);
President Barack Obama, May 2010 National Security Strategy, at 50
(stating that President Obama's Administration will pursue
ratification of UNCLOS) (available at
http://www.whitehouse.gov/sites/default/files/rss_viewer/national
_security_strategy.pdf) (last visited October 20, 2010).
Accordingly, with the exception of its deep seabed mining
provisions, the United States has consistently accepted UNCLOS as
customary international law for more than 25 years. Restatement,

80

supra, Pt. V, introductory n. ("[B]y express or tacit agreement accompanied by consistent practices, the United States, and states generally, have accepted the substantive provisions of [UNCLOS], other than those addressing deep sea-bed mining, as statements of customary law binding upon them apart from the Convention."). See United States v. Alaska, 503 U.S. 569, 588 n.10 (1992) ("[t]he United States . . . has recognized that [UNCLOS's] baseline provisions reflect customary international law") (internal quotation marks omitted) (alteration in original).

It should also be noted that UNCLOS does not represent the first time that acts of violence have been included in the definition of general piracy. While there is debate as to whether actual robbery on the high seas has been a requirement for general piracy prosecution since 1819, the view that general piracy does not require an actual robbery on the sea has certainly gained traction since the Nineteenth Century, as evidenced by the United States and British case law reviewed above, the Harvard Draft Convention on Piracy, the High Seas Convention, and UNCLOS. As a convention accepted by the overwhelming majority of countries, UNCLOS reflects the current state of customary international law, which includes acts of violence, even in the absence of an actual taking, within the definition of general piracy.

### c.  Judicial Decisions

Not only has the more expansive definition of general piracy contained in the High Seas Convention and UNCLOS obtained overwhelming support from the international community, but the United States and British case law reviewed above reflects the understanding that, for over one hundred years, the customary international law of general piracy has included acts of violence (i.e., attempts) on the high seas without an actual taking—the critical question now before this Court.  <u>In re Piracy Jure Gentium</u>, [1934] A.C. 586; <u>The Ambrose Light</u>, 25 F. at 408; <u>Dole</u>, 7 F. Cas. at 847; <u>The Chapman</u>, 5 F. Cas. at 473.[31]

Moreover, the courts of other countries have held UNCLOS to be applicable as customary international law in concrete cases, as reflected in recent judicial decisions from Kenya, the country currently handling many modern piracy cases.  Courts in Kenya have relied on the piracy provisions in UNCLOS to interpret their own domestic criminal code proscribing general piracy.  <u>See</u> Gathii, <u>Jurisdiction</u>, <u>supra</u>, at 367-380; Gathii, <u>Kenya</u>, <u>supra</u>, at 416. Much as in the United States, under Kenyan law, the international

---

[31] During early negotiations of what would later become UNCLOS, the United Kingdom unsuccessfully proposed explicitly "to include 'attempts' along with participation and incitement as part of the definition."  Alfred P. Rubin, <u>Is Piracy Illegal?</u>, 70 Am. J. Int'l L. 92, 94-95 & n.12 (1976) [hereinafter Rubin, <u>Illegal?</u>]; <u>accord</u> Rubin, <u>Law of Piracy</u>, <u>supra</u>, at 367. This point is inapposite in the instant case, however, because the definition in UNCLOS includes "acts of violence," a point that may well explain the absence of an attempt provision.

crime of piracy is defined by express incorporation of the definition of general piracy under international law. Specifically, the Kenyan penal code states that "[a]ny person who, in the territorial waters or upon the high seas, commits any act of piracy _jure gentium_ is guilty of the offense of piracy." Ahmed, at 9 (emphasis added); see also Gathii, Jurisdiction, supra, at 372 n.42. In 2006, Kenya held its first piracy trial when the United States handed over ten Somali nationals who had been captured by the USS Winston Churchill after they had attacked a non-Kenyan merchant vessel. Id. at 365. As reviewed above, in examining whether they had jurisdiction to hear the piracy prosecutions, both the Magistrate Court and the High Court of Kenya relied on the piracy provisions contained in UNCLOS to give meaning to the Kenyan criminal statute, which expressly incorporated the customary international law of general piracy through its use of the phrase "piracy _jure gentium_." Gathii, Jurisdiction, supra at 372-80; Gathii, Kenya, supra, at 421-29 ("the [Kenyan] High Court was saying that . . . jurisdiction would be available under [UNCLOS], whether or not Kenya had domesticated the Convention"); id. at 429 (the High Court of Kenya upheld the exercise of jurisdiction by Kenyan courts over piracy on the high seas even in the absence of a Kenyan nexus, though new 2009 Kenyan law "definitively establishes jurisdiction in Kenyan courts over non-nationals captured on the high seas"). This actual state practice by Kenya,

83

the country currently most involved in prosecuting piracy, as well as the active support of such practice by other nations, which continue to bring other alleged pirates to Kenya for prosecution, is indicative of the fact that the definition of piracy contained in the High Seas Convention and UNCLOS have attained the status of a binding rule of customary international law. <u>Kiobel</u>, 2010 WL 3611392, at *12 (judicial decisions are sources of international law relevant to assessing whether a norm has become a rule of international law).

### d. Scholarly Writings

Contemporary scholarly sources also appear to agree that the definition of piracy in UNCLOS represents customary international law.[32] Therefore, as defined by UNCLOS, the consensus definition

---

[32] Milena Sterio, <u>Global Puzzle</u>, <u>supra</u>, at 1466 ("Article 15 of the [High Seas Convention] and Article 101 of UNCLOS both contain the most universally accepted definition of piracy.") (internal citation omitted); Tullio Treves, <u>Piracy, Law of the Sea, and Use of Force: Developments Off the Coast of Somalia</u>, 20 Eur. J. Int'l L. 399, 401 (2009) ("The fact that [Articles 100 to 107 and 110 of UNCLOS] repeat almost literally Articles 14 to 22 of the [High Seas Convention], and that some states, including the United States as well as Israel, Switzerland and Venezuela, while not bound by UNCLOS, are bound by the Geneva Convention, entails that, as a matter either of customary or of conventional law, these Articles state the law as currently in force."); Lawrence Azubuike, <u>International Law Regime Against Piracy</u>, 15 Ann. Surv. Int'l & Comp. L 43, 49 (2009) ("Although UNCLOS is a treaty and normally should be binding on only State [sic] parties thereto, in this case since the Treaty's provisions are considered a codification of customary international law, the provisions are binding on every State including non parties to [UNCLOS]."); Kontorovich, <u>Beyond the Article I Horizon</u>, <u>supra</u>, at 1217 (observing that while the "traditional definition of piracy [was] robbery, when committed

84

of general piracy under customary international law today includes acts of violence on the high seas without an actual taking. While writers on the issue do present disagreements regarding the definition of general piracy, such disagreements do not implicate the core definition provided in UNCLOS. Rather, writers disagree about the outer boundaries of the definition of general piracy, such as whether UNCLOS's requirement of "private ends" prohibits its application to terrorist activities, or whether piracy can arise in situations involving just one ship rather than two. See Michael Bahar, Attaining Optimal Deterrence at Sea:   A Legal and

---

upon the sea," the "more modern definition" of piracy is any "acts of violence or detention, or any act of depredation, committed for private ends' aboard a vessel.") (internal quotation marks and citations omitted); Kontorovich, Shi, supra, at 736 ("A 200-year-old case [United States v. Smith] is weak authority for the content of modern customary international law.  Today, the definition of piracy is codified in Article 101 of [UNCLOS] . . . ."); Jon D. Peppetti, Building the Global Maritime Security Network:   A Multinational Legal Structure to Combat Transnational Threats, 55 Naval L. Rev. 73, 92 (2008) ("Although some states have not ratified [UNCLOS], including the United States, the large consensus suggests that the UNCLOS is the best evidence of international law relating to the maritime regime, and is therefore binding on all nations.") (internal citations omitted); Michael Bahar, Attaining Optimal Deterrence at Sea:   A Legal and Strategic Theory for Naval Anti-Piracy Operations, 40 Vand. J. Transnat'l L. 1, 10 (2007) ("The United States is not a party to UNCLOS, but it is a party to the 1958 High Seas Convention.   Regardless, the definition of piracy contained within both these treaties has become customary international law, binding on all nations, including the United States."); Menefee, Updating America's Piracy Laws, supra, at 160-61 ("The international law of piracy has been at least partially codified in the [High Seas Convention] and in its successor,[UNCLOS].") (emphasis in original) (internal citations omitted).

Strategic Theory for Naval Anti-Piracy Operations, 40 Vand. J.
Transnat'l L. 1, 26-39 (2007) (arguing that terrorists fall within
UNCLOS's requirement of "private ends," and that UNCLOS also
proscribes single-ship piracy). None of these concerns, which rest
on the margins of the debate over the definition of general piracy,
implicate the factual scenario presented by the instant case.

### 3. Attack to Plunder Under 18 U.S.C. § 1659

Defendants also argue that 18 U.S.C. § 1651 cannot be read to
include mere acts of violence committed in an effort to rob another
vessel on the high seas, because doing so would render 18 U.S.C. §
1659 superfluous. Section 1659 provides:

> Whoever, upon the high seas or other waters within the
> admiralty and maritime jurisdiction of the United States,
> by surprise or open force, maliciously attacks or sets
> upon any vessel belonging to another, with an intent
> unlawfully to plunder the same, or to despoil any owner
> thereof of any moneys, goods, or merchandise laden on
> board thereof, shall be fined under this title or
> imprisoned not more than ten years, or both.

18 U.S.C. § 1659. Defendants are correct in their assertion that
reading § 1651 to include acts of violence without an actual taking
would render punishable as general piracy acts that also fall
within § 1659. However, what Defendants ignore are the distinct
jurisdictional scopes provided by § 1651 and § 1659. While § 1659
applies only to acts by United States citizens or foreign nationals
"set[ting] upon" U.S. citizens or U.S. ships, § 1651 provides for
the prosecution of general piracy (as opposed to municipal piracy)

with the ability to invoke universal jurisdiction. Therefore, 18 U.S.C. § 1659 is not superfluous.

For the reasons provided above, the Court concludes that Article 101 of UNCLOS reflects the modern customary international law definition of general piracy, which is applicable to 18 U.S.C. § 1651.

### D.  Due Process

Defendants assert that applying the contemporary customary international law definition of general piracy violates fundamental due process protections secured by the Constitution of the United States.  The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law.  U.S. Const. amend. V.  In short, Defendants contend that construing § 1651 to demand a flexible definition of general piracy reflecting developing international norms would necessarily subject them to punishment for crimes that are unconstitutionally vague.  However, the Court concludes that § 1651's express incorporation of the definition of piracy provided by "the law of nations," which is today synonymous with customary international law, provides fair warning of what conduct is proscribed by the statute.  18 U.S.C. § 1651.

This same issue arose in the Ninth Circuit's decision in <u>Shi</u>, though in a slightly different context.  <u>Shi</u>, 525 F.3d at 709.  In that case, Mr. Shi, a Chinese national, was serving as a member of

87

a fishing vessel registered in the Republic of Seychelles and sailing in international waters off Hawaii. Id. at 718. Shi fatally stabbed the Taiwanese captain and the Chinese first mate, who he alleged had harassed and beaten him. After Shi initially commandeered the vessel, the crew overpowered and imprisoned him. Id. He was later taken into custody by the United States Coast Guard 60 miles off the coast of Hawaii, and charged with one count of seizing control of a ship by force, in violation of 18 U.S.C. § 2280(a)(1)(A), and two counts of performing an act of violence likely to endanger the safety of the ship, in violation of 18 U.S.C. § 2280(a)(1)(B). Id. at 719-20. Shi was convicted on all counts. On appeal, Shi argued that the United States court had no jurisdiction over him. Despite the decidedly conclusory nature of the Ninth Circuit's determination that § 2280(a)(1)(A) and (B) "proscribe offenses which meet the definition of piracy"—see discussion at n.12, supra—that court found that those statutes were authorized by both the "Piracies" and the "Felonies on the high Seas" provisions of Article I, Section 8, Clause 10 of the U.S. Constitution, which grants Congress power to apply federal law beyond its borders. Id. at 720-21.

The Ninth Circuit then moved to Shi's argument that there was no nexus between the indictment's allegations and the United States, and his prosecution therefore amounted to a violation of the Constitution's Due Process Clause. Id. at 722. After

88

observing that the Due Process Clause of the Fifth Amendment "requires that a defendant prosecuted in the United States should reasonably anticipate being haled into court in this country," the court concluded that since "the acts with which Shi is charged constitute acts of piracy," to which universal jurisdiction applies, "[d]ue process does not require a nexus between such an offender and the United States because the universal condemnation of" his "conduct and the existence of the Maritime Safety Convention provided him with all the notice due process requires that he could be prosecuted in this country." Id. at 723-24; see also Kontorovich, Shi, supra, at 738; Joel H. Samuels, How Piracy Has Shaped the Relationship Between American Law and International Law, 59 Am. U. L. Rev. 1231, 1253 (2010).

The same can be said for the general piracy allegations in Count One of the present Superseding Indictment. "[T]he universal condemnation of [Defendants'] conduct and the existence of [the High Seas Convention and UNCLOS] provided [Defendants] with all the notice due process requires that [they] could be prosecuted in this country." Shi, 525 F.3d at 724. In fact, the Supreme Court has once before held that legislation defining general piracy according to its definition under "the law of nations," constitutes a sufficiently clear and constitutional execution of Congress's define and punish power. Smith, 18 U.S. at 158-62. In Smith, the Court reasoned that legislation proscribing "piracy, as defined by

89

the law of nations" constituted a sufficient execution of Congress's powers under the Define and Punish Clause because the reference to "piracy, as defined by the law of nations" had a "known and determinate meaning." Id. at 158-160. The Court found that, by incorporating the definition of piracy under the law of nations, Congress had proscribed general piracy as clearly as if it had enumerated the elements of the offense in the legislation itself, noting "[t]hat is certain which is by necessary reference made certain." Id. at 159-60. Indeed, the due process argument now raised by Defendants was the subject of the dissenting opinion in Smith. 18 U.S. at 164-83 (Livingston, J., dissenting). Accordingly, the Smith Court clearly considered, and squarely rejected, the argument now presented by Defendants, that defining piracy according to its definition under the law of nations rendered the statute unconstitutionally vague.

The Court's reasoning in Smith applies equally to the application of § 1651 today. Despite this Court's finding that the definition of general piracy may change over time as a result of clearly established developments in international norms, a proposition not unfamiliar to the Founding generation, in order for a definition of piracy to fall within the scope of § 1651, the definition must nevertheless be sufficiently established to become customary international law. Importantly, the high hurdle for establishing customary international law, namely the recognition of

90

a general and consistent practice among the overwhelming majority of the international community, necessarily imputes to Defendants fair warning of what conduct is forbidden under § 1651. Such general and consistent practice is certainly reflected by the fact that an overwhelming majority of countries have ratified UNCLOS, which reflects the modern definition of general piracy. Just as the Supreme Court found in <u>Smith</u> that the definition of piracy was readily ascertainable, it is apparent today that UNCLOS (to which Somalia acceded in 1989, over twenty years ago) reflects the definitive modern definition of general piracy under customary international law. In fact, while the Court recognizes the difference between imputed and actual notice for due process purposes, it is far more likely that the Defendants, who claim to be Somali nationals, would be aware of the piracy provisions contained in UNCLOS, to which Somalia is a party, than of <u>Smith</u>, a nearly two hundred year-old case written by a court in another country literally half a world away. As the <u>Smith</u> Court observed, "[t]hat is certain which is, by necessary reference, made certain." <u>Smith</u>, 18 U.S. at 159-60. The definition of general piracy under customary international law, i.e., the law of nations, is reflected in UNCLOS. Therefore, the definition of general piracy incorporated into 18 U.S.C. § 1651 is certain.

Furthermore, it should be noted that due process protections do not require a criminal statute to spell out every element of an

91

offense in order for the statute to pass constitutional muster. See United States v. Lanier, 520 U.S. 259, 267 (1997) (explaining that due process merely requires that criminal conduct be made knowable by the time the charged conduct takes place). While a criminal defendant must receive "fair warning" of the scope of potential criminal liability, such warnings may be provided by either the statutory text or by judicial interpretation. Id. at 266. Accordingly, "the touchstone" of the fair warning requirement "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267.

In the instant case, Defendants were fairly warned of the potential criminal liability they faced for their conduct. Section 1651 expressly incorporates the definition of piracy under the "law of nations." In so doing, the statute invokes universal jurisdiction and makes knowable what acts are prohibited by the statute just as clearly as if the acts had been written into the statute themselves. Smith, 18 U.S. at 158-60; Shi, 525 F.3d at 723-24. Furthermore, as claimed Somali nationals, Defendants were subject to UNCLOS, and thus, in a sense, already bound by the piracy provisions in UNCLOS as treaty law, separate and apart from its binding effect as customary international law. Defendants cannot now claim that, for due process purposes, they were unaware of the unlawfulness of their acts. Again, it is to this argument

92

that the Smith Court responded when it concluded "[t]hat is certain which is, by necessary reference, made certain." Smith, 18 U.S. at 159-60.

For these reasons, the Court concludes that applying the definition of piracy under modern customary international law to Section 1651 does not violate constitutional due process protections.

### E. The Definition of Piracy and the Superseding Indictment

Having concluded that the offense of piracy set forth in 18 U.S.C. § 1651 must be defined according to contemporary customary international law, and further having determined that the definition of general piracy under customary international law today is reflected in UNCLOS, which is substantively identical to the High Seas Convention, the Court must next measure the Superseding Indictment against the statutory requirements set forth in 18 U.S.C. § 1651. In so doing, the Court first examines the elements of 18 U.S.C. § 1651 and the necessarily incorporated elements of general piracy established by customary international law.

Section 1651 provides that "[w]hoever, on the high seas, commits the crime of piracy as defined by the law of nations, and is afterwards brought into or found in the United States, shall be imprisoned for life." 18 U.S.C. § 1651. Under the statutory language of § 1651 alone, to be prosecuted for piracy in the courts

of the United States, a defendant must have (1) committed the act of "piracy as defined by the law of nations;" (2) "on the high seas;" and (3) thereafter "be brought into or found in the United States." Id. With respect to the latter two elements, the facts set forth in the Superseding Indictment are all alleged to have occurred on the high seas, and Defendants were obviously thereafter brought to the United States to face the instant prosecution. With respect to the first element, because 18 U.S.C. § 1651 requires the act to be "piracy as defined by the law of nations," and that definition is provided by contemporary customary international law, the Court must enumerate the elements of piracy under customary international law as of April 2010.

As discussed above, the international crime of piracy is definitively reflected in both the High Seas Convention and UNCLOS, and UNCLOS has been accepted by the overwhelming majority of the world as reflecting customary international law. Accordingly, piracy within the meaning of Section 1651 consists of any of the following acts and their elements:

(A)  (1)  any illegal[33] act of violence or detention, or any act of depredation; (2) committed for private ends; (3) on the high seas or a place outside the jurisdiction of any state; (4) by the crew or the passengers of a private ship or a private aircraft[34]; (5) and directed against another ship or aircraft, or against persons or property on board such ship or aircraft; or

(B)  (1)  any act of voluntary participation in the operation of a ship or an aircraft; (2) with knowledge of the facts making it a pirate ship;  or

(C)  (1)  any act of inciting or of intentionally facilitating (2) an act described in subparagraph (A) or (B).

See High Seas Convention art. 15, 13 U.S.T. 2312, 450 U.N.T.S. 397;

UNCLOS art. 101, 1833 U.N.T.S. 397.

---

[33]  While the use of the word "illegal" in the definition seems a "harmless redundancy," one commentator suggests that it might have the effect of reviving the law of privateering.  Rubin, Illegal?, supra, at 93 n.7; accord Rubin, Law of Piracy, supra, at 366-67.  Moreover, a proposal by the government of Greece to strike the word "illegal" from the definition during early UNCLOS negotiations was unsuccessful.  Rubin, Illegal?, supra, at 93 & n.7; accord Rubin, Law of Piracy, supra, at 366-67 & n.192.  On the other hand, the "harmless redundancy" theory is bolstered by the fact that a comment transmitted by the Italian government to the International Law Commission during the drafting of the High Seas Convention appears to have explicitly equated "illegal acts" with acts "of violence."  Comments Transmitted in a Letter Dated 14 June 1956 from the Ministry of Foreign Affairs of Italy, 2 Y.B. Int'l L. Comm'n 60, 61 (1956).  For present purposes, it suffices to say that the Court will consider at a later time any assertion by Defendants that they did, in fact, commit the acts alleged, but that they had some legal right to do so.

[34]  Although the High Seas Convention and UNCLOS make clear that aircraft piracy is included in the definition of general piracy under customary international law, under 18 U.S.C. § 1651, the federal courts of the United States are not authorized to hear prosecutions of general piracy occurring in the air, because Section 1651 is expressly limited to those acts of piracy occurring on the high seas.  18 U.S.C. § 1651.

When measured against the requirements of 18 U.S.C. § 1651, the allegations contained in the Superseding Indictment adequately set forth the offense of piracy. First, with respect to Ali and Dire, the Superseding Indictment alleges that, while on the high seas, they boarded an assault boat, cruised towards the USS Nicholas, and opened fire upon the Navy frigate with AK-47s. No lawful right to take such actions having been alleged in the indictment, such facts constitute an (1) illegal acts of violence, (2) committed for private ends, (3) on the high seas, (4) by the crew of a private ship, (5) and directed against another ship, or against persons on board such ship, thus adequately charging Ali and Dire with the crime of general piracy.

Second, with respect to Hasan, the Superseding Indictment alleges that, while on the high seas, Hasan boarded an assault boat with an RPG, with co-conspirators Ali and Dire carrying AK-47s, and cruised towards the USS Nicholas, where Ali and Dire opened fired on the USS Nicholas with their AK-47s. Having already found that the Superseding Indictment adequately charged Ali and Dire with general piracy under the definition set forth above in part (A) of the three-part definition, the Court finds that the Superseding Indictment also adequately charges Hasan with general piracy as a voluntary and knowing participant in Ali and Dire's assault.

Third, and finally, with respect to Gurewardher and Umar, the Superseding Indictment alleges that they maintained the seagoing

vessel, from which the assault boat carrying Hasan, Ali, and Dire was launched, while their co-conspirators set out to attack the USS Nicholas. Having concluded that the Superseding Indictment alleges sufficient facts to sustain a charge of general piracy against Ali, Dire, and Hasan, the Court concludes that the Superseding Indictment also adequately charges Gurewardher and Umar with general piracy as voluntary and knowing participants in their co-conspirators' assault on the USS Nicholas pursuant to sections (B) and/or (C) of the three-part definition set forth above. Specifically, the Superseding Indictment adequately charges Gurewardher and Umar with (1) an act or acts of voluntary participation in the operation of a ship, (2) with knowledge of the facts making it a pirate ship,[35] and/or (1) an act or acts of inciting or of intentionally facilitating, (2) any illegal act of violence or detention, or any act of depredation committed for private ends on the high seas by the crew of a private ship directed against another ship or against persons or property on board such ship.

Accordingly, because the Superseding Indictment alleges facts sufficient, if proven true, to constitute the offense of general piracy under 18 U.S.C. § 1651 with respect to each Defendant, the

---

[35] Article 103 of UNCLOS defines a ship as a pirate ship "if it is intended by the persons in dominant control to be used for the purpose of committing one of the acts referred to in article 101" or "has been used to commit any such act, so long as it remains under the control of the persons guilty of that act."

Court concludes that dismissal of Count One of the Superseding Indictment is unwarranted.

### V. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Government's motion for leave to file its supplemental response and the Koh Declaration, **GRANTS** Hasan's motion to strike the Government's supplemental response and the Koh Declaration, and **DENIES** Defendants' motions to dismiss Count One of the Superseding Indictment.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to the United States Attorney's Office in Norfolk, Virginia, and to counsel for each Defendant.

**IT IS SO ORDERED**.

/s/ Mark S. Davis

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October 29, 2010